KING v. BOERNE STATE BANK et al.

(Court of Civil Appeals of Texas. San Antonio. May 14, 1913. On Motion for Rehearing, June 28, 1913.)

1. PLEDGES (§ 33*)—CONVERSION OF PLEDGE—REMEDIES OF PLEDGOR.

On conversion of property pledged by the pledgee, the pledgor may either sue for the property itself or for its proceeds, if sold, or he may maintain an action for damages for breach of the contract to keep the property safely and restore it on payment of the debt; but, if he sues only for damages for conversion, he is not entitled to judgment for the property itself.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 89, 92; Dec. Dig. § 33.*]

2. PLEDGES (§ 36*)—DEFENSES—RETURN OF PROPERTY—TENDER.

Where conversion of personal property has taken place, the owner is not required to accept a return thereof, if tendered, and hence such tender is no defense to a suit for damages for the conversion.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 92–94; Dec. Dig. § 36.*]

3. PLEDGES (§ 36*)—CONVERSION OF PLEDGED PROPERTY — ACTION FOR DAMAGES — JUDGMENT.

Since an owner of pledged property that has been converted by the pledgee is not required to accept a tender of a return thereof, but can recover the value of the property as damages, it was error in such an action to set aside the pledgee's illegal sale of the property and direct that unless it was redeemed by payment of the debt it should be sold in satisfaction of a judgment therefor.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 92–94; Dec. Dig. § 36.*]

4. PLEDGES (§ 56*)—SALE OF PLEDGED PROPERTY—DUTY OF PLEDGEE.

Though a pledge of stock had contract power to sell it at private sale without notice to the pledgor, it was still bound to conduct the sale in good faith and so as to subserve not only its own rights but the interest of the pledgor.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 152–183; Dec. Dig. § 56.*]

5. PLEDGES (§ 31*) — PLEDGED SECURITIES — SALE.

A wrongful sale of pledged property by the pledgee so as to put it out of his power to redeliver on payment of the debt constitutes a conversion.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 86–88; Dec. Dig. § 31.*]

6. PLEDGES (§ 31*)—SALE OF PLEDGED PROPERTY—ESTOPPEL.

Where a pledgor elects to assert that the relation still exists notwithstanding an unlawful sale by the pledgee, the latter is estopped to say that it has ceased and that he is the owner of the property.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 86–88; Dec. Dig. § 31.*]

7. PLEDGES (§ 31*)—SALE OF PROPERTY—CONVERSION.

When a sale of pledged property is authorized, but the purchase thereof by the pledgee in good faith is unauthorized, such purchase does not constitute a conversion; but if the purchase is a nullity it can confer no rights on the pledgee so as to exempt him from being charged with conversion if he thereafter exercises a dominion over the pledge inconsistent with his relation as pledgee and with the rights of the pledgor.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 86–88; Dec. Dig. § 31.*]

8. PLEDGES (§ 31*)—SALE OF PLEDGED PROPERTY—PURCHASE BY PLEDGEE—ASSERTION OF OWNERSHIP.

Where a sale of pledged property is made to the pledgee in hostility to the rights of the pledgor and in bad faith, and the pledgee thereafter claims absolute ownership or the right to hold the property as security for other debts than those for which it was pledged, he may be charged with conversion at the election of the pledgor.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 86–88; Dec. Dig. § 31.*]

9. PLEDGES (§ 31*)—CONVERSION BY PLEDGEE—TENDER.

Proof of tender by a pledgor of the amount due to the pledgee and of the latter's refusal to accept the tender and return the collateral pledged evidences a conversion; but no tender is required where the pledgee asserts absolute ownership of the pledge in himself, or an intention to hold it as security for debts for which it was not pledged.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 86–88; Dec. Dig. § 31.*]

10. PLEDGES (§ 31*) — SALE — BAD FAITH — CONVERSION.

Where the president of a bank to which plaintiff had pledged stock as security for a loan led plaintiff to believe that he would be given a few days in which to pay the debt after it matured, but on the day of plaintiff's conversation with the president, the latter, as president, sold the stock to himself, as an individual, without notice to plaintiff and for a grossly inadequate price, and later notified plaintiff that he could not redeem the stock except by paying other sums for which the stock had not been pledged, such facts warranted a finding of conversion on the part of the bank.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 86–88; Dec. Dig. § 31.*]

On Motion for Rehearing.

11. BANKS AND BANKING (§ 112*)—ACTS OF OFFICERS—PLEDGES—WRONGFUL SALE.

Where the president of a bank to which certain stock had been pledged for a loan wrongfully sold it to himself, as an individual, for a grossly inadequate price without notice to the pledgor, and later made assertions of ownership of the stock inconsistent with the pledgor's rights, and the bank claimed that the holding of the stock by the president inured to its benefit, it thereby became chargeable with his inconsistent assertions of ownership as against the pledgor.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 271, 272; Dec. Dig. § 112.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

12. PLEDGES (§ 31*)—SALE—CONVERSION.
Where a bank wrongfully sold certain pledged collaterals to its president for a grossly inadequate price, and he not only paid the bank the price agreed on at the sale, but also took an assignment of the debt for which the property was pledged, the validity of the transaction so far as the bank was concerned should be determined as though the sale had been made to a stranger.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 86–88; Dec. Dig. § 31.*]

13. PLEDGES (§ 48*)—WRONGFUL SALE—REMEDIES OF PLEDGOR.
Where a bank wrongfully sold certain pledged collaterals to its president for a grossly inadequate price and then assigned to him the debt for which the collaterals had been pledged, and he denied the pledgor's right to redeem except on payment of certain debts for which the property had not been pledged, the pledgor was not limited to an action to redeem the pledge on the ground that the sale treated as having been made to a stranger was voidable only, but was entitled to sue for conversion.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 113–117; Dec. Dig. § 48.*]

14. PLEDGES (§ 37*)—CONVERSION—REDEMPTION.
Where a person buys pledged stock with knowledge only that the stock has been pledged, he can be made subject only to a suit to redeem with tender of the amount due, though the property has been wrongfully sold; but where the president of a bank, acting in his official capacity, sold stock pledged to the bank for a loan, to himself, as an individual, for an inadequate price, and then denied plaintiff's right to the stock except on payment of debts for which the stock had not been pledged, such rule did not apply, but plaintiff was entitled to sue for conversion.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 95, 96; Dec. Dig. § 37.*]

15. PLEDGES (§ 37*)—CONVERSION—ACTION—MOTIVE.
Where plaintiff's stock that had been pledged to a bank for a loan was wrongfully sold to the bank's president, as an individual, for an inadequate price, and he refused to surrender the same except on payment of claims for which the stock had not been pledged, plaintiff's motives in suing for conversion instead of to redeem were immaterial and did not preclude him from having the question of the value of the stock submitted to the jury in a determination of his damages, though defendants claimed that at the time the stock was sold it was worthless.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 95, 96; Dec. Dig. § 37.*]

Appeal from District Court, Kendall County; R. H. Burney, Judge.

Action by L. W. King against the Boerne State Bank and another. Judgment for defendants, and plaintiff appeals. Reversed and remanded.

Appellant, on March 14, 1912, sued appellees, the Boerne State Bank and its president, C. J. Loe, for damages, charging such defendants with the conversion of 8,000 shares of the capital stock of the Boerne Electric Power & Manufacturing Company of the par value of $8,000, which had been pledged by plaintiff to said bank as collateral security on his note for $1,000, dated December 29, 1911, and due January 29, 1912.

Plaintiff alleged that on February 24, 1912, he had a conversation with said C. J. Loe in which he assured Loe that he was endeavoring to raise the money to pay the note, and would be able to pay same within a few days, but if the bank had to have the money and insisted upon it he would take 2,000 shares of his pledged stock and sell the same at a sacrifice of 50 cents on the dollar in order to pay the note immediately; that thereupon said Loe told plaintiff he hoped he would pay said note in a few days, and by this statement and Loe's conduct plaintiff was led to believe that it would be all right for him to let said note run for a few days, and would not have to sacrifice any of his stock, which was reasonably worth its par value; that, notwithstanding said agreement and conduct of the defendants, the bank wrongfully and maliciously, with intent to harass plaintiff and to oust him from said Boerne Electric Power & Manufacturing Company in which he was a director and one of the largest stockholders, fraudulently conspired with its president, C. J. Loe, and sold plaintiff's $8,000 worth of shares of stock to said Loe for the grossly inadequate sum of $100; that such sale was made about February 26, 1912, privately, without any notice to plaintiff and without any advertisement or publicity whatever, knowing that said stock was worth $8,000; that after receiving notice of such sale plaintiff went to the bank and tendered the amount due on his note and demanded his note and stock, but the bank refused to accept the money and to turn over to plaintiff the stock. Plaintiff further alleged that said stock was reasonably worth $8,000 and prayed that he recover $8,000 with 6 per cent. interest thereon from February 26, 1912, less whatever sum he may be found to owe the bank, and also prayed for recovery of $10,000 exemplary damages.

Defendants answered with general demurrer, special exceptions, general denial, and plea in the nature of a cross-action alleging the execution of the $1,000 note by plaintiff to the bank, the pledge of the stock, their authority to sell the stock upon default in the payment of the note, the failure of plaintiff to pay the same (and in this connection denied an agreement for forbearance set up in plaintiff's petition), the sale and delivery on February 26, 1912, of the stock to C. J. Loe for $100; that thereafter on February 26, 1912, the bank, for a valuable consideration, assigned and transferred, without recourse, the said note to the said C. J. Loe; that Loe thereby became and still was the legal and equitable owner and holder of said note; that plaintiff has failed and refused to pay the same; that upon the sale of the stock as aforesaid the bank credited the note with $100 paid it by Loe for said stock; that the stock was of no greater value than $100; that defendants are willing and

ready to return said stock to plaintiff upon payment of the note, interest, and attorney's fees. Defendants prayed as follows: "Wherefore defendants pray that plaintiff take nothing by his said suit, and that defendant Loe be quieted in the title and possession of said shares of stock, and that he have judgment against plaintiff for the balance due on said note, or if for any reason they should be held not entitled to such relief, or the sale of said shares of stock should be held invalid, then defendants pray for judgment against plaintiff for the amount of said note, principal and interest, and attorney's fees, and for the foreclosure of said lien on said shares of stock, and for decree directing the sale of said shares of stock and satisfaction of such judgment; and they also pray judgment for costs, and for general relief."

Plaintiff filed a supplemental petition containing exceptions to defendants' answer.

The jury was instructed to return the following verdict: "We, the jury, find for the defendants against the plaintiff as to his action for conversion and damages, and we further find that the sale of the pledged shares of stock, to wit, 8,000 shares of stock in the Boerne Electric Power & Manufacturing Company, was invalid, and we further find for the defendant C. J. Loe against plaintiff on his cross-action on said note for the amount thereof, principal and interest, to wit, $1,058.33, and for the foreclosure of his lien on said shares of stock."

Judgment was entered in accordance with the verdict, and plaintiff appealed.

### Summary of Evidence.

December 29, 1911, King gave the Boerne State Bank his note for $1,000, due January 29, 1912. The debt evidenced by the note had existed since the spring of 1911, and the original note had been renewed several times. Eight thousand dollars of the stock of the Boerne Electric Power & Manufacturing Company, a company of which Loe was president, had been pledged by King as collateral to secure the debt. When the note was renewed on December 29, 1911, Loe notified King that no further renewals would be made, and the note would have to be paid at maturity. On January 18, 1912, the bank mailed King notice that his note would mature on January 29, 1912, which notice was received by King two or three days before the note matured. King testified he saw Loe at once and asked him if he would extend the note, that Loe said he could not, that the bank did not wish to renew it, and that he was to endeavor to pay as soon as possible. This conversation is denied by Loe. The note was not paid. King also testified that on February 24, 1912, he told Loe he was endeavoring to raise the money to pay the note and hoped to do so in a few days and if necessary would sell the stock for $2,000, that he was pretty sure he could sell it for 50 cents on the dollar, and Mr. Loe told him he had better not sacrifice it, not to sell it below par, as the company had several thousand dollars worth of treasury stock which they wished to sell, and the sale of which might be prejudiced by a sale of other stock at a low price. Loe denied that this conversation occurred. On February 26, 1912, the bank wrote King as follows: "Boerne, Texas, February 26, 1912. Mr. L. W. King, City— Dear Sir: We have sold the collateral attached to your one thousand dollar note which matured nearly a month ago consisting of 8,000 shares of the Boerne Electric Power and Manufacturing Company stock to C. J. Loe for $100.00 and have applied the same as a credit upon your note. Yours truly, C. J. Loe, President." King also received a letter from Loe as follows: "Boerne, Texas, February 26, 1912. Mr. L. W. King—Dear Sir: I have bought from the Boerne State Bank 8,000 shares of the Boerne Electric Power & Manufacturing Company's stock issued in your name, for $100.00. I expect to make an effort to get the accounts of this company settled in some satisfactory manner within the next ten days, and if you will arrange to take care of the balance of your note to the bank of $900.00 and the money that I am spending in settling up accounts of the company within the next fifteen days, I will be glad to transfer the stock back to you. I will of course expect you to refund me what money I am out in this matter with interest from the date that I took it on. Yours very truly, C. J. Loe."

These letters were received by King either on February 26th or 27th. On March 9th King secured $1,200 from Gilleat to pay off his note to the bank. King saw Loe on February 10th at the bowling alley but did not mention the matter of taking up the note, giving as his reason for not mentioning the matter that it was Sunday and he did not talk business on Sunday. He said further, if there were any other reasons for his not mentioning the matter, they were personal reasons. Loe left for Asherton on February 10th, and King on February 11th, about 9:30 or 10 o'clock a. m., went to the bank knowing that Loe was not there, and tendered to Fred Loe and Mr. Fabra, assistant cashiers, the $1,200 and demanded his note and stock. Fred Loe produced the note, but was unable to find the stock, and King declined to pay the note unless the stock was delivered to him. Mr. Fabra told him that C. J. Loe was away and he would like to have time to communicate with him as all of King's business transactions had been with C. J. Loe. King said he would give him one hour, but called twice during the day, and finally gave Fabra until the evening to hear from C. J. Loe, but Fabra reported he had been unable to speak to Loe over the telephone. After C. J. Loe returned to Boerne, he called on King and offered to surrender the stock if

King would pay the note. King said he could not accept it, as the matter was out of his hands and in the hands of his lawyers, to whom he referred Loe. Loe says this offer was made on Wednesday, the 13th. King first testified it was either Tuesday or Wednesday, but being recalled later said he was mistaken, that Loe called on him on Thursday, March 14th, after suit had been filed.

G. W. Calrow, a brother-in-law of plaintiff, testified that about a week before the sale of the stock he had a conversation with C. J. Loe about the King transaction, and after the sale, about March 4th or 5th, he had another conversation with C. J. Loe concerning which the witness testified: "I asked if he was in the bank, and I went to the directors' room to the best of my recollection and told him that I had procured the money to take up this note. If I state the exact conversation, I have got to bring in L. E. King, for the exact conversation brings him in. I said that I had procured the money to take up the two King notes, $1,000 notes, and I asked him: 'Will you hold that stock providing those two notes are paid; will you hold that stock for a certain other note?' It doesn't make any difference what the other note was, and he said: 'No, that is now my stock. I have been under some expense and expect to be under considerable more, and it just takes $4,500 to get this stock and note.' And that was almost the sum total of the conversation. As to what I then did with reference to notifying Mr. King, I went out and told Mr. Gilleat, who was waiting for me, and both of us walked out and met Mr. King right at the lumber yard, and I told him the result of this conversation." On cross-examination he said: "I told him that I had procured the money from A. G. Gilleat. I asked him whether he would hold the stock providing those two $1,000 notes were paid, whether he would return the stock or hold it as security against another note that was in there. That was another note that doesn't enter into this case. It was a note that I was on as security with L. W. and L. E. King. The amount of that note was $3,000. He told me that he would return the stock. Mr. Loe then said, 'That is my stock.' Those are his very words. 'I have been out some expense, and I expect shortly to be out considerable more, and it will just take $4,500 to get that stock.'" King gave the report made him by Calrow as his reason for taking no further action after March 6th. C. J. Loe denied that he made any such statement to Calrow.

King made no inquiry to ascertain whether C. J. Loe had paid out anything on accounts of the Boerne Electric Power & Manufacturing Company. In fact, Loe had made no such payments at the time he offered to surrender the stock on payment of the note.

C. J. Loe testified he made the sale of the stock to himself after banking hours on February 24, 1912, without offering the same to any one else; that he saw plaintiff at the meeting of the directors of the Boerne Electric Power & Manufacturing Company that afternoon, but did not remember whether he walked to the meeting with him; that he did not tell King nor any of the directors he was going to buy the stock; that the transfer to him was made without recourse and did not require any action from the board of directors of the bank; that the transaction of his taking over the stock and note was put down on the books of the bank on February 26th; that he took over the note and stock on account of a prior agreement on his part with the directors of the bank who were dissatisfied with the loan.

Considerable evidence was introduced in regard to the value of the stock, which will not be stated, as it is immaterial upon the questions arising upon this appeal. The evidence failed to show any depreciation in the stock between date of sale of the plaintiff's stock to C. J. Loe and the date of the trial.

The note given by King contained a provision that upon default in its payment the bank had full power to sell, assign, and deliver the whole of said securities or any part thereof at public or private sale, at its option, or that of its president or cashier, without demand, advertisement, or notice of any kind, all of which were expressly waived, and that the bank itself might purchase at such sale; also, that upon indorsement or transfer of the note the collateral could be delivered to the transferee, and the bank would thereafter be relieved from any liability or responsibility in the matter. The note was indorsed on the back as follows: "Collateral sold to C. J. Loe for $100.00 2/24/12, without recourse. Boerne State Bank, Boerne, Texas. C. J. Loe, Pr."

Two checks were introduced in evidence, both signed C. J. Loe, and dated February 24, 1912, both payable to the Boerne State Bank, one for $100, which recited that it was given for 8,000 shares Boerne Electric Power & Manufacturing Company stock, L. W. King note, and the other for $900, which recited that it was for loss on L. W. King note No. 3,416. Both checks were stamped: "Boerne State Bank. Paid Feb. 26, 1912, Boerne, Texas."

On March 19th, C. J. Loe wrote King as follows: "I have your note for $1,000.00 which was due Jan. 29th, and bears 10 per cent. interest from maturity until paid. Attached to this note is 8,000 shares of the B. E. P. & Mfg. Co. stock. Please advise me by return mail if you care to pay this note and interest and have your stock returned to you."

Defendants, upon the trial, tendered to plaintiffs $8,000 worth of stock issued in lieu of the $8,000 pledged by him, which had been canceled, together with a transfer thereof, on condition that he pay the note

for $1,000 executed by him, which tender was declined.

Houston, Boyle & Storey and Cunningham & Birkhead, all of San Antonio, for appellant. Templeton, Brooks, Napier & Ogden, of San Antonio, for appellees.

MOURSUND, J. (after stating the facts as above). The trial court, though of the opinion that the sale of plaintiff's stock to C. J. Loe was invalid, concluded that plaintiff could ask nothing further than to be restored to the position the parties would have occupied had no such sale been made, and had suit been brought on the $1,000 note, with prayer for foreclosure of the lien upon the collateral. If this was a suit to recover the stock itself, in view of the absence of evidence showing a depreciation in value of such stock, or evidence of damage because of its depreciation, it could be said that even though a conversion had taken place no injury was suffered; but in this case plaintiff sued to recover the value of the stock at the time of the alleged conversion, and if a conversion took place. And he is entitled to recover such value and cannot be required to accept the stock tendered back, then the inquiry whether the stock was worth more or less than at the time of the sale to Loe became immaterial.

[1] It is well settled that upon conversion by the pledgee of the property pledged the pledgor may sue either for the property itself, or for its proceeds if sold, or may maintain an action for damages for breach of the contract to keep the property safely and restore it to the pledgor upon payment of the debt. 31 Cyc. p. 844; Hale on Bailments & Carriers, p. 160. Where plaintiff sued only for damages for conversion, he is not entitled to a judgment for the property itself. Harris v. Staples, 89 S. W. 801.

[2] Again, when a conversion takes place, the person whose property has been taken is not required to take the property back if the wrongdoer tenders the same to him, and such a tender constitutes no defense to the suit for damages for the conversion of the property. Weaver v. Ashcroft, 50 Tex. 427; Crawford v. Thomason, 53 Tex. Civ. App. 567, 117 S. W. 184; Hofschulte v. Hardware Co., 50 S. W. 608; Bitterman v. Hearn, 32 S. W. 341; Baldwin v. Davidson & Co., 127 S. W. 562.

[3] As the wrongdoer cannot require the person whose property he converted to his use to take back the property, the court is without authority to accomplish that end by a judgment setting aside the unauthorized sale and directing that, unless the property is redeemed by payment of the debt, the same shall be sold in satisfaction of such judgment. Such a judgment reinstates the plaintiff as owner of the property and deprives him of his legal right to recover the value thereof at the time of the conversion, which right is not affected by either an increase or decrease in its value subsequent to the conversion.

[4] If in this case, viewing the evidence from the plaintiff's standpoint, a case of conversion is made out, the issues should have been submitted to the jury. The pledgee, though having the power by contract to sell the collateral at private sale without notice to the pledgor, cannot escape the duty resting upon him as a trustee to conduct the sale fairly and in good faith, and in such a way as to subserve not only the rights he has, but also the interest of the pledgor. Colebrook on Collateral Securities, p. 215; 31 Cyc. p. 877 (6); King v. D. Sullivan & Co., 92 S. W. 51; Uncle Sam's Loan Office v. Emery, 49 Tex. Civ. App. 236, 107 S. W. 1157; Oriental Bank v. Western Bank & Trust Co., 143 S. W. 1176; Gillet v. Bank, 160 N. Y. 549, 55 N. E. 292; Bank v. Richardson, 156 Mo. 270, 56 S. W. 1117, 79 Am. St. Rep. 528.

[5, 6] It is well established that the wrongful sale of the pledged property by the pledgee, so as to put it out of his power to redeliver it on payment of the debt, constitutes a conversion, and it has also been frequently announced by text-book writers and courts that an unauthorized sale by the pledgee to himself does not change the relations of the parties, and therefore does not constitute conversion. It appears clear that, when the pledgor elects to assert that the relation still exists, the pledgee cannot be heard to say that it has ceased, and the pledgor is entitled to redeem the pledge.

[7, 8] It is also clear that when a sale is authorized, but the purchase by the pledgee is unauthorized, and he purchases in good faith, making the highest bid, such purchase would not constitute a conversion. But if such purchase be a nullity it can confer no rights upon the pledgee exempting him from being charged with conversion if he thereafter exercises a dominion over the pledge inconsistent with his relations thereto as pledgee and with the pledgor's rights. When the sale is made in hostility to the rights of the pledgor, that is, in bad faith, in disregard of the pledgee's duties as trustee, and the pledgee purchases at such sale and makes a claim of absolute ownership of the pledge, or claims the right to hold it as security for other debts than those for which it was pledged, it appears that he can, at the election of the pledgor, be charged with conversion of the pledge. Payne v. Lindsley, 126 S. W. 331; Luckett v. Townsend, 3 Tex. 119, 49 Am. Dec. 723; Watts v. Johnson, 4 Tex. 317; Soell v. Hadden, 85 Tex. 188, 19 S. W. 1087; Oriental Bank v. Western Bank & Trust Co., 143 S. W. 1178.

[9] Proof of tender by the pledgor of the amount due by him to the pledgee and of the latter's refusal to accept such tender and return the collateral evidences a conversion.

But a tender is not required where the pledgee asserts absolute ownership of the pledge in himself, or an intention to hold the same as security for the payment of debts for which it cannot under the contract of pledge be held as security. See the cases above cited and the following: Roberts v. Yarboro, 41 Tex. 453; Gillet v. Bank, 160 N. Y. 549, 55 N. E. 292; Uncle Sam's Loan Office v. Emery, 49 Tex. Civ. App. 236, 107 S. W. 1156; Gaw v. Bingham, 107 S. W. 931; Memphis City Bank v. Smith, 110 Tenn. 337, 75 S. W. 1065; Hagan v. Bank, 182 Mo. 319, 81 S. W. 171; Dibert v. D'Arcy (Mo.) 154 S. W. 1116. Such a declaration is equivalent to a refusal to accept if tendered, and the pledgee cannot be heard to say that the pledgor should be deprived of any rights for taking him at his word. Where a wrongful sale of the pledge is made to a stranger, no tender need be made by the pledgor before filing suit. Mullen v. Quinlan & Co., 195 N. Y. 109, 87 N. E. 1078, 24 L. R. A. (N. S.) 511.

[10] Applying the foregoing principles to this case, we will consider whether the evidence was sufficient to go to the jury on the issue of conversion of plaintiff's stock. Viewing the evidence from the plaintiff's standpoint, it shows that the bank made the sale upon the very day that plaintiff was permitted by the president of the bank to believe that he would be given a few days' time in which to pay his debt; that the sale was made for a grossly inadequate price; that no notice was given plaintiff of the sale; that it was made by the president of the bank, in his official capacity, to himself individually, without making any effort to sell the same to any one else, though having on that very day come in contact with directors of the company whose stock constituted the pledge. We think the evidence was sufficient to authorize a finding that the sale was not made in good faith and with that regard for plaintiff's interests which the law requires. The question next arising is whether the sale was made to the pledgee itself or to a stranger. Any sale of the stock as between the bank and its president, if unauthorized by the directors, is void (article 530, Revised Statutes of 1911), and, even if authority had been conferred to sell the same, the sale to himself for a grossly inadequate price could be set aside by the bank. But, whether the sale as between said parties was void or voidable, the fact remains that by the acts of its officer, for which it is responsible, dominion was exercised over plaintiff's property inconsistent with his rights thereto, in that said president claimed to own the same individually and notified plaintiff that he could not repossess himself thereof, except upon payment of sums of money for which such stock was not pledged, which he described as "the money that I am spending in settling up accounts of the company within the next

15 days." Appellees say that, in fact, at the time when the suit was brought, no such accounts had been paid by C. J. Loe, and therefore plaintiff was only called upon to pay what was due by him. We do not think that plaintiff was called upon to investigate the matter. No offer was made to let him have his stock if he paid the amount due by him before any of such accounts were paid off, and Loe having asserted that he was the owner of the property, and having announced his intention of holding the same for the payment of other debts, neither he nor the bank can be heard to assert that he did not claim to be the owner, and that, if plaintiff had upon receipt of the letter offered to pay the amount due by him, his stock would have been returned.

The record further discloses that the witness Calrow testified to a conversation had by him with Loe, in which the latter attached still other conditions to be performed before plaintiff could repossess himself of his stock. Then taking this testimony as true, which we must do for the purposes of this appeal, we find that at both times dominion was claimed over the stock inconsistent with plaintiff's rights.

We are also of the opinion that the transaction should be construed as a sale to a stranger; but, if it can be said that the bank had any possession or control of the stock after the transfer to C. J. Loe, then justice demands that it should be answerable for the conditions imposed by him as a prerequisite to plaintiff's repossessing himself of his stock. Plaintiff could have brought his suit without any tender, but on March 11, 1912, he went to the bank, during business hours, and made a tender to the assistant cashiers of the amount due on his note and demanded that his note and stock be delivered to him. Appellees say this tender was made in bad faith because plaintiff knew that C. J. Loe was out of town. Such a conclusion is not necessarily deduced from the evidence. While Loe testified that he transferred the note to himself for a check for $900, at the same time that he bought the stock for $100 and credited such amount on the note, yet in the letters written to plaintiff he was not informed of the transfer of the note to Loe, nor have we noticed any evidence that he received any such notice prior to the tender made by him. It also appears that such note was in the bank, and readily found by the assistant cashiers, but the stock was not accessible. One of the assistant cashiers testified that he told plaintiff, at the time of the tender, the note had been transferred to C. J. Loe. No assurance was given him that his tender would ever be accepted upon the conditions named by him, namely, the delivery to him of his note and stock.

If the refusal of this tender, under the circumstances, be said not to furnish any evidence of conversion, then the fact that it was made and not kept up should not alter

the positions of the parties. It should certainly not be given the effect of releasing the defendants from the consequences of a conversion, if they were at that time chargeable therewith, nor of requiring plaintiff to forego his action for damages upon an offer thereafter made to restore to him his property upon payment by him of his note. He lost no rights by his refusal of the offer to restore to him his property upon payment of his debt, whether such offer was made before or after suit was filed. A person dealing with another's property so as to render himself guilty of conversion cannot, when he decides he was wrong, or when he sees trouble brewing, restore the property unless the person wronged is willing to receive the same. The option, whether to demand and receive the property, or to demand its value at the time of the conversion, rests with the person wronged, and the wrongdoer is not permitted to decide what remedy shall be chosen by the person wronged.

We sustain the first four assignments, all of which complain of the action of the court in peremptorily instructing the jury as to the verdict to be returned, also those complaining of the charge of the court and the judgment rendered.

An offer by a person guilty of conversion to return the property converted constitutes no defense to an action for damages for conversion, as has been hereinbefore fully shown, and the assertion of such an offer should not be permitted to be pleaded nor proved when only actual damages are sued for; but when exemplary damages are prayed for, as was done in this case, such evidence is admissible in mitigation of such damages, and the offer may be pleaded and proved. Bitterman v. Hearn, 32 S. W. 341. Assignments 5, 7, and 8 are overruled.

Assignment No. 6 is sustained.

The judgment is reversed, and the cause remanded.

TALIAFERRO, J., did not sit in this case.

### On Motion for Rehearing.

MOURSUND, J. [11] Appellees, in their argument in support of their motion for rehearing, express the fear that we have been misled by the fact that they did not assign error to the trial judge's instructing the jury that the sale of the stock was invalid, and say that such ruling was without their consent, but not objected to by them because the bank had, up to the time it parted with the title to the note and the pledge, been willing to deliver the same on payment of the note, and Loe had, after his purchase of the note and pledge, always been ready to deliver the stock upon payment of the note. We agree with appellees that the bank was willing up to the time it parted with the stock to deliver it to appellant upon payment by him of his note; but we cannot agree that Loe was always ready, after he acquired the stock and note, to let appellant have the stock upon the mere payment of the note. There is a letter written by him, as well as other evidence, from which a jury could well find that he exacted additional conditions to be performed by appellant in order for the latter to repossess himself of his stock. Appellees contended in their brief that the wrongful sale of the pledge only constitutes conversion when the same is placed beyond the control of the pledgee, and that in this case the appellees did not place the stock out of their reach or control so that they could not redeliver it to appellant upon proper demand. In addition, it was contended that no sufficient tender had been made, and therefore there was no conversion. These contentions both appear to have been predicated upon the theory that the sale of the stock was invalid, but that such sale should be lightly regarded, if not overlooked entirely, while great stress should be given to the fact that the defendants between them always had the stock, and it was within their joint power to produce it, and that King should have made a tender when Loe was present, and, failing to do so, he should not be heard to say that any conversion had taken place. We considered this theory, and found it without merit, but concluded that, if the holding of the stock by Loe inured to the benefit of the bank, then it appeared clear that the bank was chargeable with his assertions of ownership inconsistent with the rights of the pledgor.

Appellants now contend earnestly that the sale to Loe was not void, but merely voidable, and that the legal title to the pledge passed to Loe and the sale to him could not be set aside in a collateral proceeding, but a direct proceeding would have to be instituted for that purpose. They say: "Of course, the bank would probably be bound by the act of Mr. Loe, its president, in making the sale under the pledge if any wrong was committed thereby; but there is no contention in this case, nor is there a scintilla of evidence to the effect, that Loe was purchasing the collateral for the bank or that the transfer of the note to Loe was not a bona fide transaction."

[12] Considering the matter from the standpoint so urged, the stock was put beyond the reach of the bank, and Loe was the only one in whose power it lay to restore the same to King. In other words, as was stated by us in our former opinion, the transaction, so far as the bank is concerned, should be viewed as if the sale had been made to a stranger.

[13] Appellees contend that when the transaction is thus viewed it presents no cause of action in favor of King against either the bank or Loe for conversion, but merely an action to redeem the pledge. They cite a portion of section 748 of Jones on Pledges,

which reads as follows: "An action of trover cannot be maintained by the pledgor to recover the value of stock wrongfully sold by the pledgee without a tender of the debt secured. The wrongful sale of the pledge does not revest the immediate right of possession of the pledge in the pledgor, and therefore the latter cannot maintain the action either for the whole value of the shares or for nominal damages." In the same section the following language occurs: "But in case the pledgee has put the securities beyond his reach by an illegal sale of them, it is said that the pledgor need not make a formal tender of the amount due, nor a demand for the securities, before bringing an action against the pledgee to redeem, or an action for the conversion of the securities." Authorities are cited in support of both propositions. In section 571a of the same work the following language is found: "If a pledgee by an unauthorized sale puts it out of his power to restore the property upon payment or tender of the debt secured, he is liable for its conversion without a demand and tender of performance by the pledgor. The observation sometimes met with in the opinion of judges, and in text-books, that the pledgor is at liberty to treat an unauthorized sale of the pledged property as a conversion by the pledgee, must be taken to refer to such a sale as puts the property beyond the control of the pledgee. In cases of that kind the pledgor may charge the pledgee as for a conversion of the property without demand or tender of performance, though he is not bound to do so, but may, by subsequent tender and demand, require the pledgee to account for the market value of the property at that time. And, of course, it is not the right of the pledgee to insist that his wrongful sale constitutes a conversion, for that would enable him, if he were allowed to do so, to take advantage of his own wrong, and by his own violation of the contract determine the time, and thus the measure of his liability for its breach.'" The quoted portion is taken from the case of Glidden v. Bank, 53 Ohio St. 588, 42 N. E. 995, also reported in 43 L. R. A. 737 with valuable and thorough notes by the editor bearing upon the various questions arising in suits for conversion by reason of invalid sales by pledgees.

The same rule is announced by the editor of L. R. A. in vol. 6 (N. S.) p. 299, under the case of Austin v. Vanderbilt, 48 Or. 206, 85 Pac. 519, 120 Am. St. Rep. 800, 10 Ann. Cas. 1123, decided by the Oregon Supreme Court, in which the court said: "The pledgee impliedly agrees faithfully to hold the pledge until the conditions have been performed upon the faith of which the choses in action, goods, or personal chattels have been delivered to him. If, in violation of his trust, he sells or disposes of the pledge, thereby putting it out of his power to return the property, it would be useless to impose upon the pledgor the burden of tendering to the pledgee the payment of the debt, or the performance of the duty before he could maintain an action against the pledgee for the damages sustained by reason of the conversion, when it would be impossible for the latter to discharge the obligation which he had undertaken. When a pledgee, by his overt act, violates the terms of his agreement, so that it cannot be specifically enforced, he necessarily severs the fiduciary relations he assumed towards the pledgor, whose remedy against him in this form of an action for the injury sustained, though treated as one for conversion, is in reality founded on the breach of the contract."

To hold that a tender is necessary before any rights can be asserted by the pledgor, after a sale by the pledgee, would mean that, if the pledgor was unable to pay the money or tender the same, he would be deprived of remedy, though the sale was made in gross violation of the duty which the law imposes upon the pledgee, namely, to exercise his control of the pledge so as to subserve the interests of the pledgor as well as his own. The cases from our courts cited in our former opinion are in line with the authorities which do not require the useless formality of a tender when a conversion has already taken place and has been announced by the pledgee, or when it is beyond the power of the pledgee to restore the pledge.

Appellees do not question the correctness of the Texas cases which hold that a claim of absolute ownership by the pledgee constitutes conversion, nor do they directly challenge the correctness of the decisions that a sale without authority to a stranger may be treated by the pledgor as a conversion and suit brought without tendering the amount due, but seek to make a distinction between such cases and this on the ground that authority was given the bank to make a sale of King's stock at private sale without notice. They contend that such a sale, even though wrongfully and fraudulently made, is merely a violation of the duty imposed by law to conduct the sale fairly and in good faith, and that the action is one for breach of contract, and that the only remedy the setting aside of the sale upon payment of the debt.

We cannot subscribe to such a doctrine. To so hold would mean that a bank could, under such a contract, when the debt is due, sell the collateral for a few dollars to its employés, without an effort to comply with its duty to seek to obtain a fair price, and thus appropriate the same to the use of third persons who would be entitled to hold the same until the pledgor paid off his debt. Such a sale constitutes the exercise of dominion over the pledge inconsistent with the relations the pledgee justly sustains thereto, and the pledgor may treat the same as a conversion. In this case, if King's testimony is true, he was, by Loe's language and actions, lulled into a feeling of security on the very

day that his stock was sold, and permitted to believe it would not be sold without giving him a few days' time.

While appellees do not directly challenge the correctness of the decisions holding that an unauthorized sale to a stranger may be treated as a conversion and suit maintained without a tender, yet the cases and doctrine upon which they rely are those which are not in accord with said decisions, but announce the rule that before an action for trover can be brought the immediate right of possession must be vested in the pledgor by the payment or tender of the amount due by him. Appellees state the contention as follows: "Before it could be held that he (King) was entitled to maintain an action for conversion, it would have to be held that the bank, by reason of the sale, had destroyed the lien given to secure its debt and that neither it nor Loe had any lien on the property." This technical rule relied upon by appellees would prevent the pledgee in all cases from suing for conversion unless he had paid the debt or tendered the amount thereof. When an unauthorized sale is made, the lien is not destroyed, nor is it destroyed by an assertion of ownership by the pledgee, or by his claim of right to hold it as security for other debts. It therefore appears to us that while appellees are seeking to distinguish this case from those where an unauthorized sale is made, or a claim of absolute ownership, the rule relied upon to do so would destroy the correctness of the holdings in those cases.

[14] Where a person buys pledged stock and his knowledge extends only to the fact that the same is a pledge, nothing but a suit to redeem, with tender of amount due, could be brought against him. Cook on Stock & Stockholders & Corporation Law, § 472. Loe does not occupy such a position. He knew all the facts and circumstances, and if the sale to himself was wrongful he is guilty of conversion, and can be sued therefor without any tender of the amount due on the debt. His subsequent or separate purchase of the note given by King cannot entitle him to the rights he would have had if the note had been sold him and the stock merely accompanied the same as collateral.

[15] The motives actuating appellant in suing for conversion instead of to redeem the stock are vigorously assailed by appellees; it being charged that he is seeking to assert a claim for $8,000 for stock worthless at the time it was sold. If the stock was worthless, appellant has suffered no injury, and it should not be assumed that he will recover if such be the case, but he is entitled to have the issue tried, and, should it develop that his stock was deliberately and wrongfully sold for a grossly inadequate price without any effort to procure the real value, he is within his rights in choosing his remedy.

The motion is overruled.