JOSEPH GILLET, as Assignee for the Benefit of Creditors of JOHN F. TALMAGE and DANIEL TALMAGE, Individually and as Copartners in the Firm of DAN TALMAGE'S SONS, Appellant, v. THE BANK OF AMERICA, Respondent.

1. BANKING — CONSTRUCTION OF AGREEMENT OF CUSTOMER FORMULATED BY BANK. Where a note, made by a customer to his bank for a loan, contains provisions as to the collateral security furnished, and its application by the bank, in a form prepared by the bank and constituting a contract in words chosen by it, the instrument is to be liberally construed in favor of the customer.

2. CONSTRUCTION OF AGREEMENT AS TO APPLICATION OF COLLATERAL SECURITY. If the language of such an instrument can without violence be interpreted to include, as the object of the collateral security, only such liabilities to the bank as resulted from transactions between the parties in the relation of customer and bank, or liabilities of the customer which came into the bank's hands in the ordinary course of its banking business, that interpretation should be adopted.

3. COLLATERAL SECURITY NOT APPLICABLE TO CLAIM OF THIRD PARTY PURCHASED BY BANK. Where an agreement, in a printed form of note furnished by the bank and signed by a customer on obtaining a loan for the amount of the note, by which the customer pledged certain property as collateral security for the payment of the note " or any other liability or liabilities of the undersigned to the said bank, due or to become due,

or which may hereafter be contracted or existing," is properly construed, in accordance with the reasonable intention of the parties, as referring only to liabilities of the customer to the bank in the ordinary course of its banking business, the bank is not entitled to retain the pledged property for the purpose of applying it upon a note of the customer to a third party, which, although drawn payable at the customer's bank, was not paid by it or charged to the customer's account, but was dishonored, and then purchased, by the bank.

*Gillet* v. *Bank of America,* 21 App. Div. 392, reversed.

(Argued October 6, 1899; decided November 21, 1899.)

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered November 9, 1897, sustaining exceptions ordered to be heard before that court in the first instance, a verdict having been directed by the Trial Term in favor of the plaintiff.

This action was brought to recover damages for the wrongful conversion, by defendant, of certain securities alleged to belong to the plaintiff.

The facts, so far as material, are stated in the opinion.

*Theron G. Strong* and *Roger S. Baldwin* for appellant. The note signed by Dan Talmage's Sons, being in the printed form prepared and used by the Bank of America, should, when its meaning or construction is in doubt, be interpreted most favorably to the makers. (*Rickerson* v. *H. F. Ins. Co.,* 149 N. Y. 307; *Nicholas* v. *N. Y. C. & H. R. R. R. Co.,* 89 N. Y. 370; *Mynard* v. *S. B. & N. Y. R. R. Co.,* 71 N. Y. 180; *Fullerton* v. *C. Nat. Bank,* 17 Misc. Rep. 533.) It is contrary to the reasonable construction of the language of the note, as well as the intention of the parties as gathered from its terms, to so interpret it as to extend the collateral to cover liabilities of the makers to third persons purchased by the bank, instead of construing its language according to its clear meaning as covering only the liabilities of the makers to the said bank. (*Dodge* v. *Gardiner,* 31 N. Y. 239; *Wilson* v. *Randall,* 67 N. Y. 338; *Kilpatrick* v. *Dean,* 3 N. Y. Supp. 60.) The Bank of America, as pledgee, occupied a position of trust with respect to the pledgor and the pledge,

and any use of the pledge, otherwise than for the pledgor's interest, was a breach of trust and a fraud on the pledgor and a conversion of the pledge. (*Lewis* v. *Mott*, 36 N. Y. 395; Edwards on Bailments, 237; *Bennett* v. *Austin*, 81 N. Y. 308; Story on Bailments, § 324; Schouler on Bailments, § 218; *Duncan* v. *Brennan*, 83 N. Y. 487; *Wyckoff* v. *Anthony*, 90 N. Y. 442; *Talbot* v. *Frere*, L. R. [9 Ch. Div.] 568; *Reynes* v. *Dumont*, 130 U. S. 354; *Fulton* v. *Whitney*, 66 N. Y. 548.)

*Charles E. Rushmore* for respondent. The rights of the defendant became fixed as of March 4, 1896, the date when it acquired the note for $5,000, and the plaintiff, being an assignee for the benefit of creditors under an instrument executed and delivered thereafter, March 6, 1896, occupies no better position with respect to the securities in question than was held by his assignors prior to the assignment. The case must be determined, therefore, as if the parties to it were the plaintiff's assignors and this defendant. (*Goodwin* v. *Wertheimer*, 99 N. Y. 152; *Flynn* v. *Ledger*, 48 Hun, 468; *Schieffiin* v. *Hawkins*, 14 Abb. Pr. 112.) The contract contained in the promissory note includes within its terms the right of the Bank of America to apply the collateral security deposited with it to the extinguishment of the note for $5,000 acquired by the bank at maturity and before the assignment to the plaintiff, and without knowledge or notice thereof. (*Agawam Bank* v. *Strever*, 18 N. Y. 502.) The contract must be construed in accordance with the natural meaning of the words employed. (*Engler* v. *Fischer*, 102 N. Y. 400; *McCluskey* v. *Cromwell*, 11 N. Y. 601.) Irrespective of the general question involved, the note for $5,000 having been made payable at the Bank of America, that bank's dealings with respect thereto bring it directly within even the limited meaning given to the terms of the collateral note by the appellant. (*Griffin* v. *Rice*, 1 Hilt. 184; *Ætna N. Bank* v. *F. Nat. Bank*, 46 N. Y. 88.) The action being for conversion, if, upon any state of facts, it appears that the defendant was

entitled to the possession of the property at the time of plain-
tiff's demand, or, if the plaintiff was bound to recognize the
defendant's claim upon the $5,000 note, the court erred in
directing a verdict for the plaintiff. (*Cass* v. *Higenbotam*,
100 N. Y. 252.)

MARTIN, J. The plaintiff's assignors constituted the firm of
Dan Talmage's Sons, and as such were customers of the
defendant, which was engaged in the banking business in the
city of New York. For a considerable time before the 22nd
day of January, 1896, the defendant had not discounted any
of the commercial paper of the assignors, although they had
considerable outstanding. They had, however, kept their
account at this bank for years. On that day they procured a
loan from the defendant of $35,000, executed a note therefor
and delivered to it certain property and securities to insure the
payment of the loan.

The note was a printed one prepared by the defendant,
which, in addition to the promise of payment, contained pro-
visions as to the collateral security furnished and its applica-
tion by the bank. By this instrument the loan was made
payable on demand with interest at the rate of six per cent
per annum. It then provided that "having deposited with
the said bank as collateral security for the payment of this or
any other liability or liabilities of the undersigned to the said
bank, due or to become due, or which may hereafter be con-
tracted or existing, the following property, viz.: Memorandum
of Rice per statement attached : The undersigned hereby
agree to deposit with the said bank such additional collateral
security as the said bank may from time to time demand ; and
also hereby give to the said bank a lien for the amount of all
the liabilities aforesaid upon all the property or securities at
any time given unto or left in the possession of the said bank
by the undersigned ; and, also, upon any balance of the deposit
account of the undersigned with the said bank.

" On the non-performance of the foregoing agreements as to
furnishing additional collateral, or upon the non-payment of

any of the above-mentioned liabilities, then, and in either such case, the said bank is hereby authorized to sell, assign and deliver the whole or any part of the said securities, or any substitutes therefor, or any additions thereto, or any other property at any time given unto or left in the possession of the said bank by the undersigned for safe-keeping or otherwise, at any broker's board or at public or private sale, at the option of the said bank, or of either of its officers, without either advertisement or notice, which are hereby expressly waived. If such securities or property are sold at public sale, the said bank may itself purchase the whole or any part thereof, free from all right of redemption on the part of the undersigned, which is hereby waived and released. In the case of any such sale the said bank may first deduct all the expenses for collection, sale or delivery of the property or securities so sold, and may then apply the residue to any one, or more, or all of the said liabilities, whether due or not due, as either of its officers shall deem proper, making proper rebate for interest on liabilities not then due, and returning the overplus, if any, to the undersigned, who shall remain liable to the said bank for any deficiency arising upon any such sale. The undersigned do hereby further authorize the said bank at its option, at any time, to appropriate and apply to the payment of any of the said liabilities, whether now existing or hereafter contracted, any and all moneys now or hereafter in the hands of the said bank on deposit, or otherwise, to the credit of or belonging to the undersigned, whether the said liabilities are then due or not due. The undersigned further agree that upon any transfer of this note the Bank of America may deliver the said collaterals, or any part thereof, to the transferee, who shall thereupon become vested with all the powers and rights above given to the said bank in respect thereto, and the said Bank of America shall thereafter be forever relieved and fully discharged from any liability or responsibility in the matter."

The New York Life Insurance and Trust Company held a note made by the assignors for $5,000 which matured March

4th, 1896. It was payable at the defendant's bank, and upon presentation it was not paid or charged to the maker's account, but was dishonored. Subsequently, and on the same day, the defendant purchased the note of the payee, and then sought to hold the property pledged for the security of the $35,000 loan until the $5,000 note was paid. That the defendant obtained this note by purchase and sale, and not by payment in pursuance of the implied direction arising from the note having been made payable at the defendant's bank, is plainly alleged in the defendant's answer and fully established by its uncontradicted proof.

The question in this case is whether, under any proper construction of the contract, the defendant was authorized to retain the property pledged until the $5,000 note was paid.

The respondent's contention is that this agreement and note authorized the defendant to hold the property pledged, not only as security for the sum loaned and such other liabilities as were contracted or existed between them as bank and customer, but also for any and all claims against the plaintiff's assignors which it might purchase, regardless of their character, so long as they were liabilities of the assignors and owned by the defendant. It further claims that under the contract it could have transferred the note and collaterals, and that thereupon the transferee would be entitled to retain and sell the property pledged, or in its possession for safe-keeping or otherwise, not only for the payment of the liabilities of the assignors to the defendant, but also for the payment of all and any claims or liabilities of theirs held by the transferee. If these contentions are to be sustained, it must be because they are plainly stated in the contract or necessarily implied from its express provisions. Such unusual and almost unlimited power over the property of another is not to be implied or inferred from doubtful or uncertain language.

If there is any uncertainty or ambiguity as to the meaning of the agreement, it should be resolved in favor of the plaintiff, as it was the defendant who prepared this contract. If there is any doubt as to the meaning of the terms employed,

the defendant is responsible for it as the language is wholly
its own.   We think the principle controlling as to the con-
struction of insurance policies and other similar instruments
is applicable to this agreement, and that it should be liberally
construed in favor of the plaintiff.   If the language can,
without violence, be interpreted to include only such liabili-
ties .to the defendant as resulted from transactions between
the plaintiff's assignors as customers and the defendant as a
bank, or their liabilities which came into its hands in the ordi-
nary course of its banking business, it should be adopted.
(*Mynard* v. *Syracuse, Bing. & N. Y. R. R. Co.*, 71· N. Y.
180; *Nicholas* v. *N. Y. C. & H. R. R. R. Co.*, 89 N. Y.
370; *Rickerson* v. *Hartford F. Ins. Co.*, 149 N. Y. 307, 313.)

The reason of the rule that the language of an instrument
is to be construed against the person who proposes it rather
than against the person who is invited to accept it, is that men
are supposed to take care of themselves, and that he who
chooses the words by which a right is given, ought to be held
to the strict interpretation of them, rather than he who only
accepts them.   Where a doubt exists as to the meaning of
words, resort may be had to the surrounding facts and cir-
cumstances to determine the meaning intended.   If the lan-
guage of a promise may be understood in more senses than
one, it is to be interpreted in the sense in which the promisor
had reason to believe it was understood.   (*White* v. *Hoyt*, 73
N. Y. 505.)

In the construction of written contracts it is the duty of the
court, as near as may be, to place itself in the situation of the
parties, and from a consideration of the surrounding circum-
stances, the occasion and apparent object of the parties, to
determine the meaning and intent of the language employed.
Indeed, the great object, and practically the only foundation
of rules for the construction of contracts is to arrive at the
intention of the parties.   This is a most conspicuous and far-
reaching rule, and involves the nature of the instrument, the
condition of the parties and the objects which they had in
view, and when the intent is thus ascertained, it is to be effectu-

ated unless forbidden by law. " Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish." (*Robertson* v. *O. E. Co.*, 146 N. Y. 20, 24; *Halpin* v. *Insurance Co. of N. A.*, 120 N. Y. 73; *Smith* v. *Kerr*, 108 N. Y. 31, 37; *Coleman* v. *Beach*, 97 N. Y. 545, 553; *Parshall* v. *Eggert*, 54 N. Y. 18, 23; *French* v. *Carhart*, 1 N. Y. 102; *Colwell* v. *Lawrence*, 38 N. Y. 74; *Cotheal* v. *Talmage*, 9 N. Y. 554; *Booth* v. *Cleveland Mill Co.*, 74 N. Y. 15; Beach on Modern Law of Contracts, § 702; Bishop on Contracts, § 380; Lawson's Rights, Remedies and Practice, § 2316.)

It is quite obvious that the primary purpose for which the plaintiff's assignors pledged to the bank the property described and any balance which they had on deposit was to secure the payment of the $35,000 loan. That was the only transaction in the nature of a liability which existed between the parties or was then contemplated by them. By the agreement the assignors pledged the property mentioned and their deposit in the defendant's bank for the payment of the note of $35,000, or any other liability of the assignors *to* the bank, whether due or to become due, or which subsequently might be contracted or existing. It seems clear, when this agreement is construed in the light of the principles and authorities cited, and in view of the circumstances and transactions existing between the parties, that the most the defendant can properly claim for this provision is that it was intended to secure the liabilities of the assignors to the bank arising out of the business transactions or relations existing, or which should subsequently exist, between them as bank and customer, or which came into its hands in the ordinary course of its banking business, whether past, present or future. Under this language the bank could not hold the property pledged as security for a claim, unless it was a liability of the assignors *to* the bank, or obtained in the usual course of business. The agreement was obviously intended to include those liabilities only.

It is improbable to suppose that the defendant, one of the

great financial institutions of the city of New York, and the plaintiff's assignors, who were prosecuting a large business in that city, intended that the assignors' property so pledged, their deposit account, and all their property which came into its possession for safe-keeping or otherwise, should be and remain pledged and be liable to be sold or transferred for any or all the claims and demands that the bank might see fit to purchase. If an opposite intent was to be supposed, then the assignors in effect transferred all their property in the possession or under the control of the bank and their bank account to the defendant, not only to secure the loan and any liability arising out of the business transactions between them, but also, to the detriment and exclusion of the other creditors of the assignors, to secure such of their creditors as the bank might see fit to prefer by the purchase of their claims. Indeed, if the construction contended for by the respondent is correct, then, on the day when the loan was perfected and its amount placed to the credit of the assignors, it might have purchased sufficient of their outstanding paper, whether due or not, to absorb the entire loan, and then have demanded its payment and appropriated any and all money standing to their credit, the securities and property pledged and any other property in its hands for safe-keeping or otherwise, and thus in effect transferred all the property of the assignors within its reach to such creditors as it might select, to the extent at least of its ability to purchase such liabilities. We find nothing in the agreement that would justify any such harsh and unreasonable, if not absurd, construction. When we consider the character of the business in which the parties were engaged, the relations between them, and the obvious purpose for which the collateral security was given, it is quite manifest that no such intention existed in the minds of either.

Where there is uncertainty or doubt as to the meaning of words or phrases used in a contract, in seeking for the intent of the parties as evidenced by the words used, the fact that a construction contended for would make the contract unreasonable and place one of the parties at the mercy of the other,

may properly be taken into consideration. (*Russell* v. *Aller-ton*, 108 N. Y. 288; *Wright* v. *Reusens*, 133 N. Y. 298, 305; *Jugla* v. *Trouttet*, 120 N. Y. 21, 28.)

We think nothing is found in this contract which shows any clear intention upon the part of either the bank or the plaintiff's assignors to furnish or receive collateral, to be held as security for the payment of the debts of the assignors owing to third persons, which should be purchased by the defendant. The purchase of the five-thousand-dollar note was in no way connected with any transaction between the assignors and the defendant, nor was it procured in the usual course of the defendant's business. It is true that the plaintiff's assignors sought to have the defendant pay this note by making it payable at its bank. But that it refused to do. If it had paid the note in pursuance of the implied request, flowing from the fact that the note was made payable at the defendant's bank, then the transaction would have been one between the parties and might have fallen within the intent of this agreement. Making the note payable at the defendant's bank was equivalent to a direction to the bank to pay the amount and charge it to the maker's account. (*Ætna Nat. Bank* v. *Fourth Nat. Bank*, 46 N. Y. 88.)

But no such condition exists here, for the defendant dishonored the note and refused to pay or charge it to the assignors' account. After it had been thus dishonored the defendant purchased it of the New York Life Insurance and Trust Company, and then sought to bring it within the provisions of the agreement. We think that could not be legally done. The liabilities to the bank, which were contemplated by the parties, were those which arose out of transactions between them, and not through a title to which the bank succeeded by purchase or assignment.

In the court below the reversal in this case seems to have been based upon the word "existing," which occurs in the sentence "this or any other liability or liabilities of the undersigned to the said bank, due or to become due, or which may hereafter be contracted or existing." It is quite obvious that

the words "may hereafter be contracted or existing" were intended to include liabilities which had matured, those which had not matured, those which might thereafter be contracted or thereafter exist, although previously contracted, or those founded upon implied liabilities arising out of transactions between them, as in the case of a dishonored check or note deposited, or an overdraft from which a liability to make the account good was to be implied. All these would be liabilities to the bank, while the five-thousand-dollar note was not a liability to the defendant, but to another corporation, to the rights of which the bank had succeeded by assignment or other independent transfer. To hold that by the language of this agreement the parties contemplated giving security to the defendant for any and all claims which it might purchase, would be to extend the security to all the outstanding debts of the assignors which the defendant might have the ability and be willing to buy. That the parties intended any such effect by the words employed, we do not believe. Their minds never met upon a provision which would include any such outside transactions, and no such result could have been intended. It is equally obvious that the language of this agreement, when read in the light of the circumstances and facts surrounding the transaction, and when the principles of construction already stated are applied, does not justify the conclusion contended for by the respondent.

We think the trial court was correct in holding that the intention of the parties was to give the defendant the benefit of the collaterals named to secure the payment of the $35,000 loan and any other liability arising out of their dealings as bank and customer, but did not include a pledge of them as security for claims held by third parties which might thereafter be purchased by the bank.

The assignors transferred the securities and property described to the defendant, and the latter received them only for the purpose of securing the liabilities of the assignors to it under the terms of the agreement. When, therefore, it went further and attempted to secure the five-thousand-dollar

note of the New York Life Insurance and Trust Company with the property of the assignors pledged for the security of the $35,000 loan, its action was unauthorized, and it was guilty of a breach of its trust as pledgee. The most that can be said of the interest which the defendant had in the securities pledged is that it had a lien thereon for the amount of its loan to the assignors. The title to them still remained in the latter and passed by assignment to the plaintiff subject to the terms of the agreement. Unless the agreement had so provided, the defendant could not have sold the securities thus pledged upon default in the payment of the amount of the note and interest without resort to legal proceedings. The relation created by the transactions between the parties was that of trustee and *cestui que trust.* As was said by BROWN, J., in *Wheeler* v. *Newbould* (16 N. Y. 392, 398) : " His (meaning the pledgee's) character is that of trustee for the pledgor, first, to pay the debt, and second, to pay over the surplus, and he cannot so deal with the trust property, so as to destroy or even impair its value." (Colebrooke on Collateral Securities, § 87 ; *Hawks* v. *Hinchcliff,* 17 Barb. 492, 502.)

It cannot properly be claimed that the action of the defendant in purchasing an independent claim against the assignors and attempting to hold their collaterals as security for its payment was in accordance with its duties and responsibilities as such trustee.

We are of the opinion that the case was properly decided by the trial court, that the Appellate Division erred in reversing its determination, and that the decision of the Appellate Division should be reversed and that of the Trial Term affirmed, with costs.

All concur.

Order reversed, etc.