UNION TRUST COMPANY *v.* POCAHONTAS SPECIAL
SCHOOL DISTRICT.

4-3598

Opinion delivered November 19, 1934.

*Moore, Gray, Burrow & Chowning* and *S. S. Jefferies,* for appellants.

*George M. Booth, Frauenthal & Johnson* and *Walter L. Pope,* for appellees.

MEHAFFY, J. The Randolph State Bank of Pocahontas, on October 10, 1930, borrowed $20,000 from the Bankers' Trust Company of Little Rock, and executed its promissory note for said amount, and pledged as collateral security for the payment of said note or other indebtedness, notes and warrants aggregating $37,723.37. The Randolph State Bank was also indebted to the Union Trust Company of Little Rock in the sum of approximately $27,000. The payment of this note was also secured by collateral. In November, 1930, the Randolph State Bank became insolvent, and thereafter the Bankers' Trust Company, the Union Trust Company and the State Bank Commissioner concluded that the collateral held by the Union Trust Company as security for the debt due it was insufficient, and that the collateral held by the Bankers' Trust Company was more than sufficient to pay the debt due it. They therefore concluded that the Union Trust Company should purchase, and it did purchase, the note held by the Bankers' Trust Company, which at that time amounted to $7,484.59, and they applied the collections from the collateral held by the Bankers' Trust Company to the entire indebtedness,

treating the debt to the Union Trust Company and to the Bankers' Trust as one item. Among the collaterals held by the Bankers' Trust Company were school warrants of the Pocahontas Special School District, amounting to $6,238.23.

In November, 1932, the appellants filed suit in the Randolph Chancery Court against the Pocahontas Special School District and others. They prayed judgment for $3,103.98, the amount of the warrants held at that time by the Union Trust Company against the Pocahontas Special School District and H. L. Haynes, treasurer of Randolph County, and the sureties on his bond, and against the State Board of Education for any part of the money now in its hands. Appellants also asked that a mandamus be granted commanding the treasurer to pay the appellants the amount sued for, together with interest, and that a writ of mandamus be granted directing the State Board of Education, its members and C. M. Hirst, Commissioner of Education, to refund and pay to appellants the sums of money sued for, and they also prayed that said money be impounded by order of the court. Appellants also asked for a restraining order and injunction.

The appellees filed answer denying the sale and delivery of the warrants to the Randolph State Bank; denied the execution of the note to the Bankers' Trust Company, and denied the transfer of the note to the Union Trust Company, together with the warrants as collateral security; denied that appellants had any right to judgment or injunction or restraining order; and alleged that the appellee, Pocahontas Special School District, had on deposit in the Randolph State Bank, on November 4, 1930, $7,400, and that the treasurer had no opportunity to pay the warrants mentioned in the complaint, and that the loss of the deposit was caused by the negligence and indifference of appellants.

A reply was filed by appellants denying all affirmative allegations in the answer.

A. Brizzolara, Jr., vice president of the Union Trust Company, testified in substance that he had a conversation on August 21, 1931, with Mr. Haynes, who represent-

ed the Pocahontas Special School District, and that Mr. Haynes offered to pay $3,100 in full settlement for the school warrants. Witness referred the matter to Mr. Jernigan, vice president of the Union Trust Company in charge of out-of-town banking matters, and the matter of settlement was left in the hands of Mr. Tom Bigger, and that said settlement was rejected. Mr. Bigger declined to recommend the settlement because the value of the remaining pledged assets was doubtful. The school warrants taken over from the Bankers' Trust Company amounted to approximately $6,000. The note of the Bankers' Trust Company and collateral was purchased by the Union Trust Company at the request of the State Banking Department, and also to strengthen the collateral held by the Union Trust Company. The note held by the Bankers' Trust Company was for $7,484.59. After the Union Trust Company purchased the note, it treated the amount due from the Randolph State Bank as one item, and credits were made upon collections of collateral without reference to the former indebtedness due the Union Trust Company as distinguished from the indebtedness bought from the Bankers' Trust Company. The authority for consolidating the collateral was obtained from the State Banking Department. Witness does not know whether the collections on the collateral obtained from the Bankers' Trust Company exceeds the sum of $7,484.59. The Randolph State Bank still owes the Union Trust Company approximately $12,000 exclusive of the Bankers' Trust Company note. The purpose of purchasing the note of the Bankers' Trust Company was for the benefit of the Banking Department, the benefit of the depositors in Randolph State Bank, and for the benefit of the Union Trust Company, and the transaction did result in material benefits. The Union Trust Company took over $37,723.37 in face value collateral from the Bankers' Trust Company. The amount realized on this collateral has been applied on the entire indebtedness of the Randolph State Bank to the Union Trust Company at the time of the purchase from the Bankers' Trust Company.

We do not deem it necessary to set out the evidence in full, nor any further evidence except the evidence relating to the settlement.

The county treasurer testified in substance that the school district had on deposit in the Randolph State Bank on November 4, 1930, the day the bank became insolvent, approximately $7,400; warrants aggregating approximately $3,160 held by the Union Trust Company had been paid. Witness testified to a conversation with Mr. Brizzolara, offering to pay $3,100. The amount of warrants held by the Union Trust Company at that time was something over $6,000; that Brizzolara told him that the proposition sounded interesting, and that he would write Mr. Bigger, and that, if Mr. Bigger thought it would be satisfactory, he would accept the proposition. Witness took the matter up with Mr. Bigger, who had received a letter from Mr. Jernigan, about the compromise. When asked to state his understanding about the compromise, witness said: ''Well, I just paid him according to the agreement, and the agreement was that he was to pay half to them, and we would talk about the matter of the offset.'' The reason all the warrants were not demanded was that witness understood there would have to be an order of the chancery court authorizing the offset.

G. S. Jernigan testified that they were holding the warrants and other collateral which they received from the Bankers' Trust Company as security for the total indebtedness due from the Randolph State Bank. As to the settlement, this witness testified in substance that he did not favor the settlement unless he was absolutely assured that the remaining collateral would be sufficient to pay the full indebtedness. Bigger was given authority to settle if he thought the remaining collateral would be sufficient. He had never heard from Mr. Bigger. Witness did not know how much had been collected out of the collateral attached to the Bankers' Trust Company note, but would furnish a list showing collections. The purpose of purchasing the note from the Bankers' Trust Company was to strengthen the position of the Union Trust Company, and assist the Randolph State Bank in

protecting collateral. Mr. Bigger had no authority to make any compromise except by consent of Union Trust Company.

Mr. Bigger also testified that the note of the Bankers' Trust Company and collateral were taken over by the Union Trust Company with the consent of the State Banking Department; that the collateral and other unpledged assets of the Randolph State Bank would be security to the Union Trust Company for the total indebtedness of the Union Trust Company. This witness also testified about receiving a letter from the Union Trust Company authorizing him to accept 50 per cent. compromise if he thought that the remaining collateral would be sufficient to make the Union Trust Company absolutely safe. Mr. Haynes, the treasurer, paid to witness $3,100, and told witness he would get a letter from Little Rock authorizing him to release all the warrants.

Contract between Union Trust Company and Bankers' Trust Company, with the approval of the Bank Commissioner, was introduced in evidence; letter from Jernigan to Bigger, and letter from Bigger to Jernigan; a list of school warrants and other collateral was introduced.

The court found for the defendants, and the case is here on appeal.

It is contended by the appellants that the Union Trust Company had a right to apply the proceeds of the collateral which it received from the Bankers' Trust Company to the payment of the pre-existing indebtedness of the Union Trust Company, as holder of the note. The word "holder" used in the note from the Randolph State Bank to the Bankers' Trust Company had reference only to negotiable instruments. The statute defines the word "holder" as follows:

"Holder means the payee or indorsee of a bill or note, who is in possession of it, or the bearer thereof." Section 7761, Crawford & Moses' Digest.

The first case to which attention is called by the appellants is the case of *Oleon* v. *Rosenbloom*, 247 Pa. 250, 93 Atl. 473, Ann. Cas. 1916B, 233, and the same case in L. R. A., 1915F, 968. This case was discussing a nego-

tiable note as collateral, and the court said: "The term 'holder,' as applied to negotiable paper, has always had the well-recognized legal meaning of the payee or indorsee of it, entitled to receive the sum for which it calls." The court further said in the same case: "These notes were in every respect negotiable, and these plaintiffs had given them that character. * * * With knowledge which the law presumes the appellants had that their notes, negotiable in form, might, and probably would, pass from the payee into the hands of another holder, no other meaning is to be given to their agreement as to the right of a subsequent holder to use the collateral than that given to it by the superior court."

Appellant calls attention to the case of *Richardson* v. *Winnissimmet National Bank,* 189 Mass. 25, 75 N. E. 97, and to the case of *Mulert* v. *National Bank of Tarentum,* 210 Fed. 857. These cases both are to the effect that the word "holder" means either the payee or his indorsee; and since the note gives power to sell, this power may be exercised by the indorsee.

In the case of Richardson, *supra,* the note is not set out, but the court said: "This note plainly shows the intention of the parties that the right to enforce the payment of it should pass to the order of the payee, and that the party thus designated would be the holder."

The court however called attention to *Gillet* v. *Bank of North America,* 160 N. Y. 549, 55 N. E. 292, and the court in that case said: "The note was a printed one prepared by the defendant, which, in addition to the promise of payment, contained provisions as to the collateral security furnished and its application by the bank. * * * The undersigned further agree that upon transfer of this note, the Bank of America may deliver said collaterals or any part thereof to the transferee, who shall thereupon become vested with all the powers and rights above given to said bank in respect thereto. * * * The respondent's contention is that this agreement on the note authorized the defendant to hold the property pledged, not only as security for the sum loaned, and such other liabilities as were contracted or existed between them as bank and customer, but also for any and all claims

against the plaintiff's assignors which it might purchase, regardless of their character, so long as they were liabilities of the assignors and owned by the defendant. It further claims that under the contract it could have transferred the note and collaterals, and that thereupon the transferee would be entitled to retain and sell the property pledged or in its possession for safe-keeping or otherwise, not only for the payment of the liabilities of the assignors to the defendant, but also for the payment of all and any claims or liabilities of theirs held by the transferee.''

The court further said: ''If there is any uncertainty or ambiguity as to the meaning of agreement, it should be resolved in favor of the plaintiff, as it was the defendant who prepared this contract. * * * If the language can, without violence, be interpreted to include only such liabilities to the defendant as resulted from transactions between the plaintiff's assignors as customers and the defendant as a bank, or their liabilities which came into its hands in the ordinary course of its banking business, it should be adopted.''

The court then held that the collaterals could be resorted to only for the payment of the debts due the bank, to which the note was made.

In the other case relied on, *Mulert* v. *National Bank of Tarentum, supra,* the note involved there expressly provided for the payment of this or any other liability or liabilities of the undersigned to the holder thereof.

But the note given by the Randolph State Bank pledges the collateral security for the payment of this note or any other indebtedness or any other liability of the said undersigned to the Bankers' Trust Company. It does not say, ''or the holder.'' Therefore there is no authority in this note to give the assignee, as holder, a right to apply the collections from this collateral to any other indebtedness. It is true that the clause giving a right to sell the collateral uses the word ''holder,'' but there is no authority in the note for the payment to any holder except the Bankers' Trust Company.

This transfer or sale by the Bankers' Trust Company to the Union Trust Company would not, in any

event, deprive the debtor of any defense that he might have had against the original assignor previous to the assignment. Section 477, Crawford & Moses' Digest. The question then is, what defense would the debtor have as against the Bankers' Trust Company?

Evidently when it paid the debt due the Bankers' Trust Company, it would be entitled to a return of its collateral. The Bankers' Trust Company could not hold it to pay the debt of another. Moreover, the Randolph State Bank, being insolvent, the title to all of its assets was vested in the State Bank Commissioner. The Bankers' Trust Company had the right to resort to its collateral for payment of its debt, and nothing more.

The Randolph State Bank became insolvent on November 4, 1930, and the Union Trust Company purchased the note from the Bankers' Trust Company on March 19, 1931. The sale and transfer was made without any order of the chancery court, and without any authority of law. After the Randolph State Bank failed, no one had authority to make a contract by which the collateral held by the Bankers' Trust Company could be used to pay the debt of the Union Trust Company, and, even if the sale and transfer were valid, and the securities liable for the payment of the Bankers' Trust Company note, the collateral could not have been used to pay anything except the indebtedness due the Bankers' Trust Company. The sale, as we have said, could not have been lawfully made without permission of the chancery court. Section 720, Crawford & Moses' Digest; Act 496 of 1921.

"Where the principal debt is sold and the collateral is transferred with it, the purchaser takes the debt and collateral on the same footing on which it was taken by the original creditor, being charged with the same duties respecting it, and entitled to the same benefits therein. He stands, so to speak, in the shoes of the seller. Thus the assignee holds the collateral subject to the right of redemption by the pledgor on payment of the debt." 21 R. C. L., 673.

The Bankers' Trust Company held this collateral subject to the payment of its debt. The pledgor had a right to pay that debt and redeem the collateral. No

contract by any of the parties could deprive him of this right.

When the Randolph State Bank failed, the rights of its creditors became fixed, and it would be a fraud on its creditors to permit anybody to make a contract whereby any portion of its assets should be applied to the payment of a debt other than the debt which they were given to secure.

Appellants also contend that there was no compromise made, and they call attention to several authorities discussing the law of accord and satisfaction. This principle of law is not involved. In the first place, it is not claimed that the debt was reduced in any way, or satisfied by paying a sum less than the debt. The Union Trust Company held no obligation of the school district, except certain school warrants. The school district did not owe the Union Trust Company any debt, and there was therefore no compromise of a debt. The undisputed evidence shows that the school district had refused to pay the warrants held by the Union Trust Company, but that the school district agreed to pay approximately $3,100 if the Union Trust Company would deliver to them all the warrants, amounting to something more than $6,000.

Mr. Bigger was given authority to make the settlement. He however testifies that he did not approve it because there was not enough collateral remaining to pay the entire debt. He evidently meant the debt due the Union Trust Company, and the debt due the Bankers' Trust Company, because all the evidence shows that they treated the two debts as one item and applied the collections from the collateral attached to the Bankers' Trust Company note to the payment of both notes. This they had no right to do. But Mr. Bigger knew that they had at all times refused to pay the warrants; he knew that the $3,100 which he received was paid with the understanding that all the warrants would be delivered. It cannot be claimed that the payment was made except on this condition, because all of the evidence shows that the school district had refused to pay. Mr. Bigger was told by the treasurer, who acted for the school district,

that he would receive a letter from the Union Trust Company with reference to the compromise, and he did afterwards receive this letter. Mr. Haynes, the treasurer, after his conversation at the bank with Mr. Brizzolara, went back to Pocahontas and gave Mr. Bigger a check for $3,134.25, which Mr. Bigger accepted and kept for several days, and then sent to the Union Trust Company.

We think there was substantial evidence to show that this compromise was made. If it was not the intention to carry out the agreement, the check should not have been kept.

There is some evidence about an offset, and Mr. Haynes said that they could attend to that later. The offset that he had in mind evidently was to use its deposits in the Randolph State Bank as an offset against the warrants, and to do this, the treasurer understood that they would have to have authority from the chancery court.

As to whether the compromise was made was purely a question of fact, and we cannot say that the finding of the chancellor was against the preponderance of the evidence. The decree is therefore affirmed.