FRANCISCO DEL MORAL, demandante y apelante, *v.* THE NATIONAL CITY BANK OF NEW YORK, ET ALS., demandados y apelado el Banco mencionado.

Núm. 6891.—*Sometido:* Junio 4, 1937. *Resuelto:* Noviembre 4, 1937.

*José Sabater*, abogado del apelante; *Oscar Souffront*, abogado del Banco apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

Francisco del Moral y Nadal inició este pleito en la Corte de Distrito de Mayagüez contra The National City Bank of New York en solicitud de una sentencia a favor de los herederos de doña Carmen Nadal Viuda de del Moral por la suma

de quince mil setecientos cincuenta y seis dólares, intereses y costas.

El demandante es uno de dichos herederos y como los demás no quisieron unírsele, los incluyó en el pleito como demandados, y al dejar de contestar, pidió y obtuvo la anotación de su rebeldía. El banco demandado contestó. Fué el pleito a juicio y la corte lo resolvió por sentencia de agosto 31, 1934, declarando la demanda sin lugar con costas. Y es contra esa sentencia que se ha interpuesto el presente recurso de apelación.

 No hay controversia en cuanto a los hechos. Ambas partes están conformes en que la mercantil de Mayagüez, Moral & Co., S. en C., tomó prestados al National City Bank of New York doce mil dólares, suscribiendo a la orden de dicha institución bancaria tres pagarés, uno por cinco mil, otro por cuatro mil y otro por tres mil, y en que doña Carmen Nadal Viuda de del Moral, comanditaria entonces de dicha mercantil, garantizó la operación entregando al banco bonos valorados en quince mil setecientos cincuenta y seis dólares, bajo las condiciones que se hicieron constar en el siguiente documento:

"May 17, 1927.—The National City Bank of New York—55 Wall Street—New York City—Dear Sirs: The undersigned, a silent partner in the firm of Moral & Company, S. en C., of Mayagüez, Porto Rico, hereby pledges and authorizes you to hold and retain as collateral security for any and all existing or future indebtedness of said firm to you or to any of your Branches together with all expenses of collection which you may incur in connection therewith, the following securities belonging to the undersigned now in your possession in New York City:

"$1,000.00 Kansas City, Memphis & Birmingham, 4s—1934.

"$7,000.00 Baltimore & Ohio, First 4s—1948.

"$1,700.00 Père Marquette, First 5s—1956.

"$5,000.00 Père Marquette, First 4s—1956.

"Eleven (11) shares Père Marquette 5% Preferred Stock.

"In the event that any such indebtedness now due or owing or which may hereafter become due or owing to you by said firm is not paid at maturity, you are hereby authorized to sell all or any

part of said securities, with or without notice to the undersigned, either at public or private sale, or at any brokerage board, and after deducting all costs and expenses of every kind for collection, sale or delivery, to apply the proceeds of such sale or sales upon any such indebtedness so owing to you by said firm.—You are hereby further authorized, at your option, to apply upon any such indebtedness or other liability of said firm to you, now or hereafter arising, any or all moneys or other property, together with the proceeds thereof, which is now or may hereafter be deposited with or left with you by or for the account or credit of the undersigned or in which the undersigned may have any interest. All remittances and property shall be deemed left with you as soon as. put in the transit to you by mail or carrier.—The undersigned expressly waives demand for payment and notice of nonpayment of any indebtedness now due or owing or which may hereafter become due or owing to you by said firm, and hereby consents that you may extend the time of payment of all or any of such indebtedness; also that you may release any security for all or any of such indebtedness which you may have or hold at any time or times without affecting in any manner your rights or interests in any securities or other property of the undersigned so pledged to you as aforesaid.—This agreement is to be construed and enforced in accordance with the laws of the State of New York.—(firmado y rubricado) CARMEN N. VDA. DEL MORAL—(Seal) Witness: (firmado) F. DEL MORAL.''

Vencidos los pagarés y no pagados, fueron renovados y vueltos a vencer sin ser satisfechos, el banco no se decidió a cobrarse haciendo efectiva la garantía colateral hasta agosto de 1931 en que dirigió una carta a doña Carmen del Moral Viuda de Romero, tutora de doña Carmen Nadal viuda del Moral, declarada incapaz desde julio de 1929, informándole que estaba considerando vender los valores pignorados para cobrar la deuda a menos que ésta fuera satisfecha o se hiciera algún abono substancial a la misma dentro del plazo de quince días. La tutora contestó en la siguiente forma:

''. . . No he intervenido en esa operación; pero sea cual fuere el paso que sobre ella dé su oficina de Nueva York, será por su cuenta y riesgo, teniendo en cuenta que doña Carmen Nadal está incapacitada hace ya tiempo, y que en cuanto a las obligaciones cuyo cobro

reclama esa sucursal debe tenerse muy presente que ellas están sometidas a un procedimiento de nulidad no resuelto aún.''

Enterado el banco de la contestación de la tutora, le dirigió otra carta en octubre 9, 1931, como sigue:

''En relación con su carta de septiembre 10 de 1931, deseamos aclararle que en nuestra carta de agosto 26 hacíamos referencia no sólo a las obligaciones de Moral & Co., S. en C. y de doña Carmen Nadal con nuestra sucursal de Mayagüez y que son las que están sometidas a un procedimiento judicial, sino que también nos referimos a otras obligaciones de dicha sociedad y doña Carmen con nuestra sucursal de San Juan, las cuales no están envueltas en procedimiento judicial alguno, montantes a $12,000 de principal más los intereses devengados sobre las mismas y no pagados.''

Cruzáronse otras cartas entre la tutora y el banco a los efectos de liquidar los asuntos pendientes, sin resultado, hasta que el banco en noviembre 10, 1931, le dijo:

''Nos referimos a nuestra carta del 26 de octubre último, según copia que le incluímos y confirmamos nuestro telegrama de hoy, como sigue: 'Refiriéndonos a nuestra carta de veintiséis de octubre pasado nos urge recibir su visita durante esta semana para tratar asunto mencionado en la misma. De lo contrario nos proponemos considerar la venta inmediata de los valores según le avisáramos en nuestra carta a usted de veintiséis de agosto último.' Le agradeceríamos su inmediata atención a este asunto, . . .''

Y en enero 12, 1932, le comunicó:

''De acuerdo con el documento de prenda fechado 17 de mayo de 1927, firmado por doña Carmen Nadal Viuda de del Moral, deseamos informar a usted que nuestra oficina de Nueva York ha vendido los siguientes valores pignorados por doña Carmen para garantizar el pago de las obligaciones de Moral & Co., S. en C. con el Banco:

''$1,000.00—De Kansas City, Memphis and Birmingham, 4s March 1, 1934, vendidos en_____ $696. 67

''$7,000.00—De Baltimore & Ohio First Mortgage 4s July 1, 1948_____ 5, 796. 78

''$1,700.00—De Père Marquette First A 5s July 1, 1956 _____ 622. 33

"$5,000.00—De Père Marquette, First B 4s July 1, 1956 _____ $1, 828. 06

"11 acciones preferidas de Père Marquette 5%_____ 70. 84

"Subtotal_____ $9, 014. 68
"Menos: Deducido por cambio_____ 22. 54

$8, 992. 14

o sea un neto de ocho mil novecientos noventa y dos con 14/100 dólares. Esta cantidad ha sido aplicada como sigue:

"Para cancelar el pagaré de Moral & Co., S. en C. fechado 4 de marzo de 1930, a favor de nuestra casa de San Juan_____ $4, 000. 00

"Para cubrir intereses en dicho pagaré desde junio 2, 1930 hasta enero 5, 1932_____ 582. 00

"Para cancelar el pagaré de Moral & Co., S. en C. fechado 24 de marzo, 1930, a favor de nuestra casa de San Juan_____ 3, 000. 00

"Para cubrir intereses en dicho pagaré desde junio 23, 1930 hasta enero 5, 1932_____ 420. 75

"Para abonar a cuenta del pagaré de Moral & Co., S. en C. por $5,000.00 a favor de nuestra sucursal de San Juan que queda reducido después de este abono a la suma de $4,674.36_____ 325. 64

"Para cubrir los intereses devengados en dicho pagaré de $5,000.00 desde julio 26, 1930 hasta enero 5, 1932__ 663. 75

"Total_____ $8, 992. 14

"Retenemos en nuestro poder a su disposición los dos pagarés cancelados que arriba se mencionan."

Su propósito de vender los bonos fué también comunicado por el banco desde diciembre 22, 1930, a Moral & Co., S. en C., de la cual mercantil era socio gestor el demandante. Y la manera cómo fueron los bonos vendidos finalmente la expuso el banco por medio de su testigo Fernando Bobonis quien declaró substancialmente que era subauditor del National City Bank of New York en San Juan, teniendo a su cargo el departamento de préstamos desde hacía aproximadamente siete años, que los bonos se vendieron a mediados de diciembre de 1931 por la oficina de Nueva York usando los servicios

de un "broker" al mejor precio obtenible, habiendo seguido después bajando el mercado de valores.

Sostiene el apelante en su alegato que el banco no pudo vender los bonos después de haber sido declarada incapaz la garantizadora prendaria. Admite que ella autorizó antes la vénta, pero alega que debiendo estimarse la autorización como un mandato, éste expiró cuando cesó la capacidad de la demandante.

Tal como se pactó expresamente por las partes este caso debe regirse por las leyes del estado de Nueva York, y ninguna ley o decisión de dicho estado se cita por el recurrente que sostenga su contención.

Cuando la señora Nadal Viuda de del Moral garantizó las obligaciones de la mercantil de que era socia comanditaria, estaba en la plenitud de sus facultades. Desde entonces ella misma, por su propia voluntad, se desprendió de sus bonos— propiedad mueble—entregándolos al banco para que dispusiera de ellos conforme a lo pactado. El contrato quedó consumado. Y la autorización para vender—parte de dicho contrato—no puede considerarse como un poder abierto para ejecutar nuevos contratos que lógicamente cesa con la muerte o la incapacidad mental del ponderdante.

El hecho de la incapacidad de la señora Nadal Viuda de del Moral lo tuvo en cuenta el Banco. De ahí que se comunicara directamente con su tutora y le expusiera la situación y cuáles eran sus propósitos. Nada más se ha demostrado que tuviera la obligación de hacer el banco bajo las circunstancias concurrentes.

Sostiene además el apelante que se trata de un contrato unilateral impreso que debe interpretarse en contra del que lo preparó, el banco, citándose al efecto el caso de *Gillet* v. *Bank of America,* 160 N.Y. 549 (55 N.E. 292), que resuelve que "cuando un contrato está en una fórmula impresa hecha por el banco y firmada por el cliente, será interpretado en favor del cliente y en contra del banco."

No hay prueba alguna de que se trate de un contrato impreso. Al contrario, quedó demostrado por el propio contrato original, elevado después de celebrada la vista del recurso con autorización del tribunal, que fué redactado en maquinilla.

Pero aunque se aplicara la regla establecida para los contratos impresos ya que en verdad fué redactado por el propio banco, aceptada la redacción como lo fué por la garantizadora que lo autorizó con su firma puesta de su puño y letra siendo testigo su hijo y socio de la mercantil garantizada, el propio demandante Francisco del Moral, y siendo tan claros y precisos sus términos, por desfavorable que sea su interpretación contra el banco, siempre habrá que concluir que el banco quedó garantizado y pudo hacer como hizo efectiva la garantía.

En cuanto a que la dilación del banco dañó los intereses de doña Carmen, que son hoy los de su heredero, el demandante, bastará decir que si bien es verdad que si los bonos se hubieran vendido un año antes, por ejemplo, se hubiera obtenido más por ellos, ninguna obligación ineludible de realizar tal venta anterior surgió de acuerdo con los hechos y la ley para el banco y que la prueba demostró que el banco hizo buen uso de su criterio cuando vendió los bonos al convencerse de que la baja era una realidad y continuaría como continuó en efecto.

Bajo las circunstancias concurrentes no puede calificarse de ruinoso el precio obtenido por el banco, ni hay prueba alguna de que el banco actuara de mala fe o fuera negligente. Jamás la parte interesada pidió al banco que hiciera efectiva la garantía antes del tiempo en que lo hizo. Tampoco se demostró la insolvencia de Moral & Co., S. en C., antes, al tiempo ni después de la venta de los bonos.

*En tal virtud debe declararse sin lugar el recurso y confirmarse la sentencia apelada.*

El Juez Asociado Señor Córdova Dávila no intervino.