Robert M. Jackson, Respondent, *v.* Hunt, Hill & Betts et al., Appellants.

First Department, June 18, 1959.

*William H. Timbers* of counsel (*James E. Bennet, Jr.,* and *Helen F. Tuohy* with him on the brief; *Hill, Betts & Nash,* attorneys), for appellants.

*Herbert P. Polk* of counsel (*Robert McLeod Jackson,* respondent in person), for respondent.

*Per Curiam.* Plaintiff-respondent, who had been associated with the appellants' law firm since 1900 and had been a partner since 1913, duly withdrew from the firm as of December 31, 1954. In this suit for an accounting, plaintiff was awarded an interlocutory judgment directing an accounting of all fees earned by the defendant firm up to and including December 31, 1954, of the value of the tangible physical assets of the firm, and of the cash profits for the year ending December 31, 1954, even though not received until after his retirement. Defendants-appellants contend that all plaintiff was entitled to was to share in the cash net profits of the firm which included only fees which had been billed and collected at the date of plaintiff's retirement.

Plaintiff's right to the relief depends upon the construction of the partnership agreement, dated December 14, 1953, and particularly upon the provisions of article IV (§ 2, subd. [b]) of that agreement referring to the rights of a withdrawing partner. Section 2 of article IV of the agreement is concerned with the rights of a deceased partner and those of a withdrawing partner. Before 1951, the provisions of agreements among the partners made no distinction between a deceased partner and a withdrawing one as to their rights upon severance, and such provisions were joined in a single clause. After 1951, including the agreement of December 14, 1953, the respective rights were delineated in two separate paragraphs, making provision for distinct categories, one covering the death, and one the withdrawal, of a partner.

The provision as to a deceased partner read: "Article IV * * * Section 2 * * * (a) in the event of death of a Partner his estate shall receive his proportionate share of net fees in all matters pending at the time of death, whether billed or unbilled. Such payment of net fees shall be made as if the Partner had remained alive; provided, however, the individual Partners hereby specifically authorize and empower their

respective distributees, executors or administrator to make an agreement with the surviving Partners for settlement at any time of all claims the estate of the deceased Partner has against the firm."

As to a withdrawing partner the contract provided: " Article IV * * * Section 2 * * * (b) In the event of the withdrawal of a Partner from the firm an estimate shall be promptly made of the Net Profits of the firm as of the date of such withdrawal, such estimate shall be made by CHARLES B. HILL and in the event that he does not act, then by the three senior Active Partners and either of such estimates shall be deemed the actual Net Profits of the firm as of the date of such withdrawal; the firm shall have the option to delay payment, in whole or in part, of any Net Profits due the withdrawing Partner for one year from the effective date of such withdrawal."

In effect, the decision of the trial court has ignored this separate treatment of deceased and withdrawing partners and has construed the partnership agreement as if there had been no significant change in the two categories after 1951. There is no dispute that under article IV (§ 2, subd. [a]) the estate of a deceased partner is entitled to his share, up to the date of his death, of all matters pending at that time, billed or unbilled. Plaintiff has been sustained in his contention that while the wording of the subdivisions (a) and (b) of section 2, are different, there has been merely a change in the method of computing the share of a withdrawing partner, and that he still is entitled to his share of the fees received after the date of his withdrawal.

We are unable to agree with that interpretation. From the language of the agreement itself, from the vicissitudes of the partnership agreements before and after 1951, and from the testimony at the trial, it seems to us that, as a result of the change in the agreements after 1951, a withdrawing partner is entitled only to the cash net profits received by the firm as of the date of his withdrawal. The purpose underlying a different treatment of withdrawing partners and deceased partners, was to make withdrawal from the firm unattractive. While it is reasonable to pay the estate of a deceased partner a share of the fees earned up to the date of his death no matter if subsequently paid (since in the ordinary course of events much of his business and his clients continue to remain with the firm and the other partners may reap the benefits thereof), different considerations come into play when a partner withdraws. Ordinarily, the partner who voluntarily

withdraws, either because of dissatisfaction with the operation of the firm or a feeling that he can do better financially outside the firm, takes with him both his cases and his clients and deprives the other partners of this source of income. In restricting the withdrawing partner's share to the cash net profits as of the date of withdrawal, the agreement removes any attractive incentive which withdrawal would otherwise offer.

The learned Trial Judge resolved whatever ambiguity existed in the agreement in favor of the construction urged by plaintiff. In so doing, he rejected the testimony of six of the current partners. Instead reliance was placed on the evidence given by the plaintiff and another former partner. We find that the Trial Judge gave undue weight to the testimony of plaintiff and Cherbonnier, and should have accepted the evidence of the six current partners as to the interpretation of the agreement in any ambiguous aspects.

If the parties had intended that a withdrawing partner was to receive his share of net fees in all matters pending at the time of his withdrawal, whether billed or unbilled, they could have used the same words which were used to describe the same payment due the estate of a deceased partner. Their failure to do so in the light of the evidence impels a conclusion that different treatments were intended.

Nor do we find any basis for an accounting as to the tangible assets of the defendant firm. The partnership agreement makes no provision for payment to a withdrawing partner of any share of the tangible assets of the firm This is especially significant since in the agreements before 1951 there was such a provision.

Finally, there is no necessity for an accounting of the cash net profits for the year ending December 31, 1954. The accounts of the firm as of that date were audited by Peat, Marwick, Mitchell & Co., the firm's regular certified public accountants, and their audit and report are in evidence. The amount found due in that report has been paid to plaintiff. Since there are no specific objections to that report, there is no need for any further accounting.

The interlocutory judgment should therefore be reversed, on the law and the facts, and the complaint dismissed, without costs.

M. M. FRANK, J. (dissenting in part). On a prior appeal (2 A D 2d 971) we held that the contract in question was ambiguous and warranted a trial '' as to the actual practice in the firm and other evidence in support of what was understood and acted upon by the partners.''

After conflicting testimony was adduced concerning the intention of the parties at the time of the execution of the agreement, the trial court resolved the issue in favor of the plaintiff. It seems to me that the record sustains the determination, and there is little to require a rejection of the judgment in view of the admitted ambiguity of the contract.

According to the partnership agreement, net fees represented the balance remaining after all expenses were subtracted from the gross fees earned. Net profits were defined as the balance remaining after 10% was deducted from net fees and transferred to the capital fund. These definitions control the provisions of article IV of the contract applying to the death or withdrawal of a partner, and quoted in the majority opinion. If, as asserted by the defendants, the term "net profit" was intended to mean cash fees actually billed and collected rather than the balance left from the gross fees earned, whether billed or not, it would have been simple for the parties, all of whom were members of the Bar, to so state. There would have been no need then for an "estimate" of net profits, as subdivision (b) provides.

It follows, therefore, that there is no justification for equating net profits with cash fees.

From the record, it is a fair conclusion that the real distinction intended between subdivisions (a) and (b) was that under the former, a partner was entitled to receive his proportionate share of net fees in all matters "pending" at the time of his death, regardless of billing, whereas under the latter he was limited to his share of fees on completed matters only.

The defendants' version of the intention of the parties is not warranted by the evidence and does not permit a reasonable construction of the agreement, for it would require that payment be received by the firm for services previously rendered, before the withdrawing partner became entitled to his proportionate share. That interpretation would enable the firm to deprive the withdrawing partner of his portion merely by delaying the billing or collection of earned fees. The contract should not be construed to place the plaintiff at the mercy of the defendants (see *Gillet* v. *Bank of America,* 160 N. Y. 549, 557). Under such circumstances, the plaintiff would lose not only his share of the fees for services not completed at the time he withdrew, but more significantly, be deprived, in the nature of a penalty or forfeiture, of his share in fees completely earned, but not billed or collected. The law abhors a forfeiture (see *Matter of Herzog,* 301 N. Y. 127, 137; *Schnitzer* v. *Fruehauf Trailer Co.,* 283 App. Div. 421, 432; affd. 307 N. Y. 876).

The plaintiff questions the accuracy of the financial statement submitted by the accountants for the firm. In my opinion, we should not rule that the plaintiff is conclusively bound by the accountants' report and thereby barred from the opportunity of proving it inaccurate. Moreover, this aspect of the litigation was not considered by the trial court but was reserved for the accounting. Thus the denial of an accounting and the dismissal of the complaint preclude the plaintiff from contesting the accuracy of the financial statement, to his prejudice. Generally, upon a termination or dissolution of a partnership, a partner is entitled to an accounting to determine his share, if anything. In view of the nature of the dispute an accounting is in order.

Except as herein indicated, I concur with my colleagues as to the other issues raised.

Accordingly, I dissent and vote that the interlocutory judgment be modified to delete the reference to tangible personal property in the third decretal paragraph, and otherwise to affirm.

BREITEL, J. P., RABIN and VALENTE, JJ., concur in *Per Curiam* opinion; M. M. FRANK, J., dissents in part and votes to affirm in opinion, in which STEVENS, J., concurs.

Interlocutory judgment reversed, on the law and on the facts, and the complaint dismissed, without costs.

Settle order on notice.