Matter of Pusatere v Estate of Pusatere (2025 NY Slip Op 25285)

[*1]

Matter of Pusatere v Estate of Pusatere

2025 NY Slip Op 25285

Decided on July 29, 2025

Surrogate's Court, Saratoga County

Schopf, S.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on July 29, 2025
Surrogate's Court, Saratoga County

In the Matter of the Claim of Rosario L. Pusatere, Sr., Claimant

againstThe Estate of Sona M. Pusatere, Deceased.

File No. 2023-689/A

WITECKI LAW OFFICEGlenn J. Witecki, Esq.8 South Church StreetSchenectady, New York 12305Attorney for Petitioner Roasario L. PusatereSNYDER, KILEY, TOOHEY, CORBETT & COX, LLPJames G. Snyder, Esq.160 West AvenueSaratoga Springs, New York 12866Attorney(s) for Respondents Debra M. Vale and Laura M. ByrnesJoshua ValeSelf-Represented Interested Party

Jonathan G. Schopf, S.

Petitioner is the Administrator of the Estate of Sona M. Pusatere ("Decedent") and up until her intestate death, was her husband of thirty-six (36) years. Petitioner has timely filed a claim which generally consists of allegations of the imposition of a constructive trust upon the marital residence that the Petitioner resided in with his wife for twenty-eight (28) years and continues to occupy. Petitioner had previously moved for summary judgment on the claim seeking a declaratory judgment in the form of the imposition of a constructive trust under the theory that Petitioner holds an equitable title interest in the property, or in the alternative, [*2]monetary damages. Respondent, Debra M. Vale, a distributee of the estate, opposed this relief, and by Decision and Order dated September 24, 2024, the motion was denied and a hearing was scheduled to determine the claim.
 FACTSA hearing on the claim was held February 26, 2025. Petitioner testified in his own behalf as-well-as presented testimony from a real estate agent, Daniel M. Gaudio who was qualified as an expert in market valuations, and also presented the transcript testimony of a representative from Bank of America, Nathan Musick who had testified in response to an earlier subpoena duces tecum. Respondent presented her own expert real estate appraiser, Willliam Moore, and Interested Party Joshua Vale testified on his own behalf. The Respondents Debra M. Vale and Laura M. Byrnes, although present, did not testify, other than Respondent Debra M. Vale's improper comments towards her son, Joshua Vale during the course of his testimony. All persons testifying were credible and the Court has no reason to question the veracity of any of the testimony adduced.
The essential facts are undisputed. Decedent and Petitioner were married in 1988. The Petitioner and decedent purchased the house located at 655 Kinns Road, Clifton Park, New York in 1996 during the marriage. Decedent resided in the home with her husband, the Petitioner, until her death in July of 2023. The property is essentially the sole asset of the Estate. The Estate is also potentially encumbered by certain debts of the Decedent.
The house was originally purchased under a private financing arrangement with the then seller Donald C. Greene, Jr. holding the note and mortgage on the property. This document, introduced as Petitioner's Exhibit #15 at the hearing was drafted in favor of seller and only obligated the Decedent under its terms. The Court reserved decision on the admission of this Exhibit at the hearing, but after consideration of the arguments of counsel, now admits Petitioner's Exhibit #15 into evidence. There was no testimony elicited as to why the Petitioner's name was not placed on the title at this time. Notwithstanding this, the Petitioner testified that he made all the payments to Mr. Greene as required.
Thereafter, at some unknown time, Petitioner executed a power of attorney in favor of Decedent. This was done in order for her to have the ability to obligate Petitioner as the sole obligor on a note in favor of Fleet Bank [FN1]
as part of a credit line secured with a mortgage against the property at issue. This was done with the express consent of the Petitioner. The mortgage was in the name of the Decedent solely. Petitioner testified that his name was not placed on title for liability protection reasons due to his job as an over-the-road truck driver and the advice he was given from an attorney. Petitioner was concerned that since Decedent was unemployed; if he was involved in an accident, the property could be at risk; and he did not want to risk his grandson and wife losing the residence. It was Petitioner's stated intent to make all payments under the note. Petitioner testified that he made all such payments via direct withdrawal from his bank accounts [FN2]
. The Fleet line of credit was initially used to pay off the balance of the private [*3]loan with Mr. Greene and then drawn on for various expenses. Petitioner testified that he has continued to make the payments after death and so the current balance was approximately $22,000.00 at the time of the hearing.
Decedent was married prior to her relationship with Petitioner and she had two daughters from that relationship, Debra M. Vale and Laura M. Byrnes, who are intestate distributees of the Estate along with Petitioner. Respondent Laura Byrnes had a son named Joshua Vale who has resided with the decedent and Petitioner since he was approximately ten (10) years old at the Kinns Road property. Joshua has been disabled from an accident where he lost the use of his legs.

STANDARD OF PROOF
When a fiduciary presents a petition to satisfy a personal claim in advance of the accounting proceeding, and if questions of fact arise, the court orders a hearing at which those interested in the estate will have an opportunity to be heard. Regardless of whether a hearing is held, the fiduciary should prove his claim to the court's full satisfaction (See, generally, Radigan, New York Estate Administration, 2024 Ed. §5.06).
The standard of proof on a petition for satisfaction of a claim is borne by the claimant and he has the burden of proving his claim by clear and convincing evidence (Matter of Gorden, 8 NY2d 71 [1960]). Likewise, the party seeking to impress a constructive trust on property has the burden of proving by clear and convincing evidence that such a trust is necessary to prevent unjust enrichment (Alson v. Kessler, 231 NYS2d 872 [Sup. Ct. New York County 1962], affd sub nom; Alson v. Kessler, 18 AD2d 1052 [1st Dep't. 1963]). "The clear and convincing evidence standard is satisfied when the party bearing the burden of proof has established that it is highly probable that what he or she has claimed is actually what happened" (see, Home Ins. Co. of Ind. v Karantonis, 156 AD2d 844, [3d Dep't. 1989]; see also, Green v William Penn Life Ins. Co. of NY, 12 NY3d 342 [2009]).
Title to real property vests in distributees immediately upon death, subject to certain circumstances which are not relevant for purposes of determining the instant claim. Absent the assertion of the claim for the constructive trust, EPTL §4-1.1[a][1] provides for a statutory scheme of intestate distribution whereby under the facts here, Petitioner receives fifty thousand dollars ($50,000) and one-half (1/2) of the residue while Debra M. Vale and Laura M. Byrnes receive fifty percent (50%) of the residuary balance. Subject to this distribution, the title to the real property vested in all three statutory distributees as tenants in common at the Decedent's death (In Re: Enquire Printing and Publishing Co., Inc., 26 Misc 3d 1035 [Sur. Ct. Nassau County 2009], and LCD Holding Corp. v. Powell-Allen, 203 AD3d 811 [2nd Dep't. 2022]).
The Court must now determine the validity of the claim. The Court declines to determine a value of the real property or to adjudicate and proportion the rights of the parties to their intestate share of the Decedent's estate at this time, as such determination is properly had in an accounting proceeding. 

ANALYSIS
The Court is faced with the task of delving into the dark abyss that is the law of constructive trusts. At its most basic, Black's Law Dictionary defines a constructive trust as "[a]n equitable remedy that a court imposes against one who has obtained property by wrongdoing" (Black's Law Dictionary 1649 [9th ed. 2009]). Although the elements of a constructive trust are well known, these principles "are simply guidelines and are not to be applied rigidly in pursuing the goal of preventing unjust enrichment" (Henness v. Hunt, 272 AD2d 756, 757 [3rd Dep't. [*4]2000]; Matter of Almasy v. Ward, 53 AD3d 946, 947 [3rd Dep't. 2008]). Judge Benjamin Cardozo advised that courts considering such a trust should not rely heavily on formalisms and too little on basic equitable principles, especially when family transactions are involved. "The equity of the transaction must shape the measure of relief" (Beatty v. Guggenheim Exploration Co., 225 NY 380, 389 [1919]). He added the famously oft quoted phrase: "[A] constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee" (Beatty, Id. at 386).
The only well settled law concerning constructive trusts are the four elements which must be present. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. In developing the doctrine, equity has laid down four requirements for its invocation. First, there must be a confidential or fiduciary relationship; second, there must be a promise, either express or implied; third, there must be a transfer of property in reliance thereon; and finally, there must be unjust enrichment to the transferee (Sharp v. Kosmalski, 40 NY2d 119 [1976]). 
Applying the four (4) elements of the constructive trust to the facts of any particular case gives rise to the notion that one is grappling with intellectual quicksand. When the elements are shown to exist by the proponent, the constructive trust becomes a creature of pure equity. Due to the broad constitutional equitable powers of the Surrogate [FN3]
, there is no better forum in which to encounter this many-tentacled kraken of the judicial deep. Indeed, the grant of equity jurisdiction bestowed upon the Surrogate is relevant not only as to the initial exercise of jurisdiction, but to the shaping of relief in the court's orders and decrees to ensure that justice is done (See, Matter of Abraham L., 53 AD2d 669, 670 [2nd Dep't. 1976]; see also, Matter of Raana Beth N., 78 Misc 2d 105, 110-111 [Sur. Ct. NY County 1974]).
The flexibility of the doctrine is shown in the long lines of cases which have formed the doctrine over time by applying it to a myriad number of fact patterns. "[I]t is well settled that '[a] constructive trust may be imposed when property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest' ... 'In order to invoke the court's equity powers, [petitioner] must show [the elements of a constructive trust]'" (Delzer v. Rozbicki, 85 AD3d 1722, 1722—1723 [4th Dep't. 2011]). Inasmuch as a constructive trust is an equitable remedy with defined elements, historically "courts do not rigidly apply the elements but use them as flexible guidelines" (Moak v. Raynor, 28 AD3d 900, 902 [3rd Dep't. 2006]); "[a]lthough the [Sharp v. Komalski] factors are useful in many cases, constructive trust doctrine is not rigidly limited" (See Simonds v. Simonds, 45 NY2d 233, 241 [1978]). The scope of the doctrine is sufficiently expansive to satisfy the needs of justice and to enable courts to mold its elastic remedies to meet the needs of the individual case. No wrongdoing is necessary to invoke the doctrine. Courts have long recognized that innocent parties may frequently be unjustly enriched (Miller v. Schloss, 218 NY 400, 407 [1916]). Indeed, the "broad equitable precepts that anchor the constructive doctrine permit litigants a wide berth in constructing their claims. Even if the [petitioner] cannot plead, with specificity, the four elements of a constructive trust, a court may still entertain the claim (Robinson v. Day, 103 AD3d 584, 587 [1st Dep't.2013]). 
At its most fundamental, all that is required, generally, is that a party hold property under such circumstances that in equity and good conscience they ought not to retain it (See, Miller v. Schloss, Id. at 407). It is in this spirit that the Court will analyze the instant facts vis-à-vis the four (4) elements of a constructive trust to determine if this Court's equitable powers have been properly invoked and if the Petitioner has proven his claim.

 1st Element — Fiduciary Relationship
The New York courts have long recognized that husbands and wives stand in fiduciary relationships (Christian v. Christian, 42 NY2d 63, 72 [1977] [agreements between spouses, unlike ordinary business contracts, involve a fiduciary relationship requiring the utmost of good faith]; Petracca v. Petracca, 101 AD3d 695, 698, [2nd Dep't. 2012]; and Kabir v. Kabir, 85 AD3d 1127 [2nd Dep't. 2011]). Importantly, the fiduciary relationship is critical in analyzing the conduct in this case because it implies "a duty of fairness in financial matters" (Simonds v. Simonds, 45 NY2d 233, 242, [1978]).
As the Petitioner and Decedent were husband and wife at all relevant times until the Decedent's death, the Court determines that a fiduciary relationship existed and the first element of the constructive trust claim is met.
Alternatively, the Court notes the Power of Attorney that Petitioner granted to Decedent, through which Decedent used her fiduciary power over Petitioner to borrow funds under terms that Petitioner was the sole obligor to repay the same (Matter of Trombley, 137 AD3d 1641 [2016 App. Div. 4th Dept.] [holding that a party "stood in a fiduciary relationship with decedent as her power of attorney"]). There was a clear fiduciary relationship between Petitioner and Decedent that goes to the heart of the transactions underlying Petitioner's claim. 

 2nd Element — The Promise
As with Justice Dollinger's very thorough analysis of the constructive trust in the case of McKeown v. Frederick, 39 Misc 3d 1241(A) [Sup. Ct. Monroe County 2013][FN4]
, in this court's same review of precedent, there is little guidance on the exact nature of a promise to support a constructive trust. As with an object deep in the abyss, it exists for a moment in the shadows, disappearing with the changing light, only to reemerge just out of grasp.
As other courts have noted, the form of the promise in any legal claim is significant (Martin Roofing, Inc. v. Goldstein, 60 NY2d 262, 268 [1983]). However, where a doubt exists as to the meaning of words, resort may be had to the surrounding facts and circumstances to determine the meaning intended (Gillet v. Bank of American, 160 NY 549, 555 [1899]). Such is the situation here.
In reviewing the transcript of the testimony elicited at the hearing, the Court notes an omission in the testimony. The Petitioner, under questioning, nowhere testified (nor was he directly asked) that any "promise" was made to him by his wife during her lifetime. The Court of Appeals in Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 NY2d 105, [1981] has stated that: "[b]efore the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained. Otherwise, a court, in intervening, would be imposing its own conception of what the parties should or might have undertaken rather than confining itself to the implementation of a bargain to which they [*5]have mutually committed themselves. Thus, definiteness as to material matters is of the very essence of contract law. Impenetrable vagueness and uncertainty will not do."
However, this does not end the inquiry. Other courts have accepted proof of an "implicit promise" to sustain this aspect of a constructive trust (Marini v. Lombardo, 79 AD3d 932, 934, [2nd Dep't.2010] [the second aspect of a constructive trust involving real property could be based on an implicit promise to convey it]). As pointed out by Justice Dollinger in McKeown, more than a century ago, the Court of Appeals also opined on implied promises: "[t]hey always exist where equity and justice require the party to do or to refrain from doing the thing in question; where the covenant on one side involves some corresponding obligation on the other; where, by the relations of the parties and the subject-matter of the contract, a duty is owing by one not expressly bound by the contract to the other party in reference to the subject of it. In this court we have thrown some safeguards about the doctrine to secure its prudent application and have said that a promise can be implied only where we may rightfully assume that it would have been made if attention had been drawn to it [citations omitted], and that it is to be raised only to enforce a manifest equity or to reach a result which the unequivocal acts of the parties indicate that they intended to effect" (See, Wilson v. Mechanical Orguinette Co., 170 NY542 [1902]). Similarly, almost one hundred and fifty years ago in People ex rel. Dusenbury v. Speir, 77 NY 144, 150 [1879], Justice Danforth writing for the Court of Appeals stated "[t]here is a class of cases where the law prescribes the rights and liabilities of persons who have not in reality entered into any contract at all with one another, but between whom circumstances have arisen which make it just that one should have a right, and the other should be subject to a liability similar to the rights and liabilities in certain cases of express contract." 
In modern times, New York courts have commented on the context surrounding an "implied promise": "Implied promises are recognized when either the promises are so clearly within the contemplation of the parties that it is unnecessary to express them, or when the promises are beyond the thought of the parties but necessary to effectuate the purpose of the contract ... The intentions of the parties to the contract are instructive of whether an implied promise exists and they should be determined by the words the parties employed judged in light of [real estate industry] practices" (511 West 232nd Owners Corp. v. Jennifer Realty Co., 285 AD2d 244 [1st Dep't. 2001], citing, 61 West 62 Owners Corp. v. Harkness Apartment Owners Corp., 222 AD2d. 358 [1st Dep't 1995]). Following this line of thought, one New York court has suggested that "the required promise may be inferred where the totality of the transactions and the relations of the parties would render an express promise superfluous" (Mele v. Okubo, 2010 NY Misc. LEXIS 2626 [Sup.Ct. Suffolk Cty. 2010]). It is in "this flexible spirit, the promise need not be express, but may be implied based on the circumstances of the relationship and the nature of the transaction" (Moak v. Raynor, 28 AD3d 900, 902 [3rd Dep't. 2006]; and see Sharp, Id. at 122).
Under applicable case law, the direct testimony of the Petitioner having lacked the definitiveness of an express promise is not sufficient to uphold the promise element of the constructive trust claim. Petitioner does not state that the promise was first undertaken when the property was originally purchased, but that it occurred around the time the home was refinanced and that it was his idea to have this arrangement to protect Decedent and her grandson, it was his mindset that he would go on the deed when his truck driving employment was over and until such time it was his thought to stay off the deed, and to just financially support the household with his income. He did not testify to any specific promissory language from his wife that would [*6]show she was in agreement with his plan to later add his name to the deed. There is no evidence before the Court, not precluded by the "dead-man's statute," that Petitioner, at any time, ever specifically-or otherwise-directly asked the Decedent to transfer the property into joint names, nor is there testimony about her intent to do the same. There was no testimony from the Petitioner that this plan existed prior to purchase of the home, or at the time title originally vested into the Decedent solely. In this Court's analysis, the promise would have to exist at the time of the vesting of title or at the time the establishment of all the elements of the constructive trust were met, either before or when the funds were transferred for the purchase of the home or its refinance onto the credit line.
Petitioner's testimony in the totality must be considered. Petitioner's sole belief as to the understanding of the plan to eventually place his name on the deed was because he was carrying all of the costs of the home and the marriage; he perceived himself to be a "part-owner" with Decedent; and, that he would officially go on the deed after ceasing employment as a truck driver. He was concerned that if he had an accident and Decedent was forced out of the house that it would be a hardship for her and her grandson, especially due to the disability accommodations made to the house specifically for her grandson. He testified that were she forced to move, the loss of those accommodations would have been a "major problem." He testified, credibly, that he had many conversations with the Decedent about this plan during her life and there was no disagreement between the two of them.
As in the instant case, though a promise in words was lacking, the whole transaction, it might be found, was 'instinct with an obligation' imperfectly expressed, (Wood v. Duff-Gordon, 222 NY 88, 91 [1917] see also, Janke v. Janke, 47 AD2d 445, 448—449, [4th Dep't. 1975], affd. 39 NY2d 786; and Farano v. Stephanelli, 7 AD2d 420 [1st Dep't. 1959]). 
In deciding that a formal writing or express promise was not essential to the application of the doctrine of constructive trust, Justice Cardozo further observed in language that can be applied to the instant case: "[h]ere was a man transferring to his sister the only property he had in the world. He was doing this, as she admits, in reliance upon her honor. Even if we were to accept her statement that there was no distinct promise to hold for his benefit, the exaction of such a promise, in view of the relation, might well have seemed to be superfluous" (Sinclair v. Purdy, supra at 235) (emphasis added). 
In Farano, Id. at 425, the First Department followed Sinclair and stated that the decision to invoke the remedy of constructive trust "need not be determined exclusively by whether or not the defendant daughters expressed in so many words a promise to reconvey the properties to the father if he should ask. Indeed, in the case before us, it is inconceivable that plaintiff would convey all of his interest in property which was not only his abode but the very means of his livelihood without at least tacit consent upon the part of the defendant that she would permit him to continue to live on and operate the farm" (emphasis added).
As in Sinclair and Farano, here, after hearing the testimony adduced, it is inconceivable that the Petitioner, who had financially supported not only the purchase of the subject home, but also the Decedent, and her grandchild for their thirty-five (35) years of marriage, would not have had an expectation rooted in a mutual bargain, expressed during the Decedent's lifetime that he would continue to have an ownership interest in the home after her death.
Given the long course of conduct of the Decedent and Petitioner's handling of the marital finances and ownership of property, to have expected the Petitioner to have obtained a written express promise from his wife of thirty-five (35) years, in what seems to have been a happy [*7]marriage, would be an unreasonable expectation. Nor is the same necessary, such a mutual promise can be inferred from the conduct of the mutual splitting of marital duties, whereby the Petitioner isolated the assets of the marriage from what he perceived as a dangerous occupation, earned the income of the household, directly paid the mortgage obligation, and explicitly trusted Decedent to manage the funds he sent her for the good of the home and those living there. This was referred to multiple times by the Petitioner during his testimony that he "trusted" his wife and they were a "team".
The fact that Petitioner testified he made a conscious decision, grounded in reason, to be left off the deed, while at the same time paying all of the costs of the marriage implies that this strategy was discussed between Petitioner and Decedent and gives rise to a promise made during the course of their marriage. This is further supported by the fact that this implied promise was supported by consideration. The consideration for this promise was substantial and long-term. It included the payment of all the expenses of the purchase, maintenance and upkeep of the home by the Petitioner.
Notably, given all of the accessibility features added to the home (wheelchair ramp, bathroom adaptations, and the like), Decedent can be found to have had an expectation and belief that her grandson who she raised with Petitioner and who resided in the home for approximately twenty-six (26) years would not become homeless as a result of her death. To think otherwise would be illogical. The Court cannot in good conscience, under these facts, stand by and allow the Decedent's property at her death to pass in a matter diametrically opposed to how the Decedent held and managed her property during her life with her husband. To do so would be such an equitable inbalance as to render the very economic bargain that is a marriage, meaningless.
Reaching this decision on the second element of the constructive trust claim was not lightly undertaken and much thought has been placed into this decision. In attempting to strike a balance between the cold calculus that is EPTL §4-1.1[a][1] and also to do justice as the arbiter of equity under SCPA §201 among all parties places the Court in a position of immeasurable struggle with the leviathan that is the constructive trust, but, ultimately, the facts of this case call for an equitable resolution that is in line with the Court of Appeals stated reason for finding an implied promise in Wilson v. Mechanical Orguinette Co, Id.
The Court follows the guidance of the high court, as it must, and holds that the promise was implied due to the conduct of the Decedent and Petitioner within the bounds of their marriage. This conduct as testified to by the Petitioner lends credibility that an express promise would have been made if attention had been drawn to the necessity for it, for the reasons of ensuring continuity of the domestic living situation. This finding of an implied promise is necessary to prevent a manifest injustice as the result otherwise would be to vitiate that which the unequivocal acts of the Decedent and Petitioner indicated that they intended to effect" (See, Id., Wilson v. Mechanical Orguinette Co., 170 NY542 [1902]).

 3rd Element — The Transfer
The third necessary element is that the Petitioner transferred some asset in reliance upon the promise (Henness v. Hunt, 272 AD2d 756 [3rd Dept.2000] [element may be satisfied where the party seeking to impose the trust has no prior interest in the property, but does contribute funds, time or effort to the property in reliance on a promise to share in some interest in it]; see also, Lester v Zimmer, 147 AD2d 340 [3rd Dept. 1989] and Shrifter v. Goldman, 23 Misc 3d 1120[A] [Sup. Ct. Kings County 2009]). It has been specifically recognized that a constructive [*8]trust may be imposed in the marital context where the proponent has expended specific funds or effort in reliance upon the promise (See, Terrille v Terrille, 171 AD2d 906 [3rd Dep't. 1991], and the cases cited therein).
In the instant case, Petitioner has adequately demonstrated that he has contributed funds to the property. Petitioner established by uncontroverted testimony that he played a financial role in purchasing the home, in making all of the original payments under the purchase note in favor of Donald Greene, and then subsequently obligating himself under a credit line [FN5]
secured by the home and making all payments thereon. Although there were some items that the Petitioner paid for via the credit line that were not home related, such as a vehicle for her grandson and work truck, these are of no moment, as Petitioner's uncontroverted testimony establishes by clear and convincing evidence (substantiated by the testimony of a representative of Bank of America and documentary evidence) that he was the sole payor of all expenses of the household. Petitioner also credibly testified that he paid for improvement and maintenance items that benefited Decedent's disabled grandson (wheelchair ramp, bathroom accommodations and handicap adaptations that cost approximately $20,000.00) as well as new HVAC systems (at a cost of $14,267.00). Most importantly, he was the sole payer of the mortgage and credit line at all times from the purchase of the house in 1996 until current.
In addition to these improvement items and the mortgage, Petitioner also gave the sum of approximately $3,000.00 per month to the Decedent for her use and to go towards household bills [FN6]
. He testified that this totaled over $700,000.00 spanning the term of the marriage [FN7]
. He testified that she was in charge of all the household finances, that he trusted her, and let her manage these funds in the natural order of their marriage. Accordingly, plaintiff has satisfied the [*9]third element necessary for the imposition of a constructive trust, by the transfer of funds [FN8]
.

 4th Element — Unjust Enrichment
As to the fourth element of unjust enrichment, "[t]o prevail on a claim of unjust enrichment, a party must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered" (Citibank, N.A. v. Walker, 12 AD3d 480, 481 [2nd Dep't. 2004], abrogated on other grounds by Butler v. Catinella, 58 AD3d 145, [2nd Dep't. 2008]).
Thus, herein, to prevail on the counterclaim to impose a constructive trust, Petitioner must establish that he conferred a benefit upon the Decedent, at his expense and that he did not derive the benefit therefrom (see MT Prop., Inc. v. Ira Weinstein & Larry Weinstein, LLC., 50 AD3d 751, 752 [2nd Dep't. 2008]; see also Smith v. Chase Manhattan Bank, USA, 293 AD2d 598, 600 [2nd Dep't. 2002]). In the realm of equity, unjust enrichment occurs when in "equity and good conscience[,]" a party obtains or possesses value that rightfully belongs to another party (Parsa v. State of New York, 64 NY2d 143, 148, [1984]; cf. Mente v. Wenzel, 178 AD2d 705, 706 [3rd Dep't. 1991]).
Here, the Petitioner has also met his burden of proof. He has spent enormous sums during the course of his marriage to Decedent in purchasing, maintaining, and modifying the premises to support Decedent and the needs of Decedent's grandson who still resides on the property. Decedent's grandson is in need of adequate facilities due to his disability, which such facilities exist at the subject property, having been purchased by the Petitioner.
In decisions of the Court of Appeals and other lower courts following the seminal case of Sharp v. Kosmalski, the standards for a constructive trust have shifted from an "intent enforcement remedy" to a "fraud rectifying remedy" (See Bankers Sec. Life Ins. Socy. v. Shakerdge, 49 NY2d 939 [1980] and Matter of Grancaric, 91 AD3d. 1104 [3rd Dep't. 2012]). These cases reflect that the promise which is made, must be later breached, leading to the unjust enrichment.
Here, although the facts of this case require the application of law as it affected the marital relations of the Petitioner and the Decedent, it is worth noting that this case does not arise in the context of a divorce, a commercial dispute, or any other action amongst living persons as is in the bulk of the case law cited in this decision. The Surrogate's Court derives its authority from its own distinct body of statutory and case law. SCPA §201(3) speaks to the equitable powers of the Court to do justice in all matters relating to estates and the affairs of decedents so that a full, equitable and complete disposition of the matter may be had as justice requires. Due to this grant of expansive equity jurisdiction, the Surrogate's Court is uniquely and specifically tasked with determining the intent of those who can no longer speak for themselves to ensure that their plans for the succession of their property made during life are enforced at death upon the living, who often quarrel and squabble over the flotsam and jetsam of the dead while ignoring the outgoing tide that was the wishes of the deceased. To interpret Bankers Sec. Life Ins. Socy. v. Shakerdge and its progeny in a manner that says this Court cannot pass judgment on a theory of constructive trust that enforces the intent of the deceased undermines [*10]the very Constitutional and statutory purpose of the Surrogate.
Here, however, the Court need not write further on this point. The uncontroverted facts demonstrate that the marriage between the Decedent and the Petitioner was underscored by financial infidelity which satisfies the "breach" prong of the test set forth in Bankers Sec. Life Ins. Socy. v. Shakerdge. The Petitioner furnished large sums of money to the Decedent with the expectation that she would have used the money for the upkeep of the marital residence and other expenses related to the marriage. He further expected that his name would be added to the deed at some point in time when his driving days were over. This did not occur. As set forth at footnote six (6) above, the Decedent took at least a portion of the funds given to her by Petitioner and opened secret credit card accounts upon which at least $33,653.37 [FN9]
worth of expenses were charged without the Petitioner's knowledge. Although the exact nature of the items or services purchased with the credit cards is unknown, due to the secretive nature of the accounts, the Court can draw the conclusion that the expenditures were for the sole benefit of the Decedent, to the exclusion of Petitioner. These actions constituted a breach of the fiduciary duties which required the utmost of good faith in financial matters which are implied in contract that is a marriage. (Petracca v. Petracca, 101 AD3d 695, 698, [2nd Dep't. 2012]). It cannot be overlooked that the Petitioner provided over $700,000.00 worth of funds to the Decedent, in addition to making all of the mortgage and credit line payments on the property. At least a portion of these funds were used to finance secret purchases by the Decedent. To now hold that due to the Decedent's death, Petitioner should be stripped of the full value of his marital investment would constitute a manifest injustice.
That Decedent utilized Petitioner's power of attorney to open the credit line, of which Petitioner was, and remains, the sole obligor for repayment also cannot go unmentioned. It is uncontroverted that this credit line was utilized, in part, to refinance the marital residence. To deny Petitioner the full benefit of his bargain under such circumstances would be to condone Decedent's breach of her fiduciary duty to the detriment of Petitioner. 
In addition, the intestate distributees, Debra M. Vale and Laura M. Byrnes will be unjustly enriched by the transfer of partial title to them, in that they have not contributed to the property, and have never resided there. In the case of Respondent Debra M. Vale, she will be doubly enriched as not only will she receive the benefit of the property, but the Petitioner will have paid all of the expenses for Ms. Vale's son, interested party Joshua Vale, who has resided there since he was ten (10) years old while being raised by Decedent and Petitioner. 
Joshua's narrative testimony was particularly illuminating and impactful on this point. He testified that his biological mother, Debra M. Vale had no contact with Decedent and that Decedent and Petitioner raised Joshua from the age of ten (10) and provided for him during his minority and after his accident. He testified that Respondent Debra M. Vale had never come to the house other than when Decedent died and he had only seen her twice since Joshua's accident. He was unaware of any financial support provided to Joshua by Respondent Debra M. Vale. Joshua also testified that "[Debra M. Vale] never talked to me about anything what's going on. You just decided to hurt the one person that's raised me and always been there for me, my grandfather".
Joshua further testified that Petitioner had once told him the house would be left to him [*11]eventually, but that he did not think he could take care of it himself. Lastly, when asked about his understanding of who owned the house, he stated that "[a]ll I thought was that [Petitioner] purchased it. Other than interjections from her seat at counsel's table, Ms. Vale did not take the stand to testify under oath in contravention of Joshua's credible testimony. The fourth element of the constructive trust claim has been met to the satisfaction of the Court.

 DETERMINATION OF CLAIM
Justice Gabrielli very eloquently stated the following while writing for the majority in the seminal constructive trust case of Sharp v. Kosmalski, Id.., Supra, "In so doing I would emphasize that the conveyance herein should be interpreted 'not literally or irrespective of its setting, but sensibly and broadly with all its human implications'. This case seems to present the classic example of a situation where equity should intervene to scrutinize a transaction pregnant with opportunity for abuse and unfairness. It was for just this type of case that there evolved equitable principles and remedies to prevent injustices. Equity still lives. To suffer the hands of equity to be bound by misnamed 'findings of fact' which are actually conclusions of law and legal inferences drawn from the facts is to ignore and render impotent the rich and vital impact of equity on the common law and, perforce, permit injustice. Universality of law requires equity" (internal citations omitted). 
As set forth in the above analysis of the four (4) elements of the claim, the imposition of a constructive trust is proper and necessary as a matter of equity between the parties. Courts have upheld constructive trust claims arising from a decedent's death involving implied promises regarding implied estate plans and asset protection (See, Beason v. Kleine, 96 AD3d 1611, 1614 [4th Dep't. 2012] citing, Johnson v. Lih, 216 AD2d 821, 823, [3rd Dep't. 1995]; Tordai v. Tordai, 109 AD2d 996, 997, [3rd Dep't. 1985]). The circumstances here are factually in line with precedent in other cases rooted in equity.
The Court concludes that the vesting of title in the intestate distributees, Debra M. Vale and Laura M. Byrnes is inequitable as a matter of law and sets aside such conveyance, returning title to the subject property to the Estate, to be distributed to Petitioner, subject to the payment of valid estate administration expenses and any claims which may be sought in the final accounting.As such, it is hereby
ORDERED, that Petitioner's claim is granted. Title to the subject real property commonly known as 665 Kinns Road, Clifton Park, New York 12065, formerly owned by decedent, Sona M. Pusatere is and shall be deemed transferred to and titled in the name of Rosario L. Pusatere, Sr., as Administrator of the Estate of Sona M. Pusatere; and it is further
ORDERED, that, such foregoing real property shall be transferred from the Estate of Sona M. Pusatere to the Petitioner, Rosario Pusatere via an Administrator's Deed, subject to the claims of creditors and expenses of administration, such claims, if any, to be determined in the final accounting; and it is further
ORDERED, that Respondents Debra M. Vale and Laura M. Byrnes have no further legal interest in the foregoing real property; and it is further
ORDERED, that nothing in this determination of the foregoing Claim disturbs the intestate rights of Rosario L. Pusatere, Sr., Debra M. Vale, and Laura M. Byrnes with respect to other assets of the Decedent.
DATED: July 29, 2025HON. JONATHAN G. SCHOPFSARATOGA COUNTY SURROGATEENTERED

Footnotes

Footnote 1:Bank of America became the successor-in-interest to Fleet.

Footnote 2:The mortgage states that it has a maturity date of May 2, 2023. It would appear that there were additional sums lent over time as the nearest balance to the Decedent's July 28, 2023 death was $31,863.79.

Footnote 3:See, SCPA §201 generally.

Footnote 4:Due to the excellence of this opinion's analysis of the issues in the instant case, the Court would note that it has heavily excerpted portions of this decision and its citations herein.

Footnote 5:This credit line was established by the Decedent using the power of attorney granted to her by Petitioner, providing further evidence of the agreement and course of conduct between them.

Footnote 6:He also testified that it was not until after the Decedent's passing that he discovered a Post Office Box of which he was previously unaware that was receiving credit card statements for credit cards in the Decedent's name. Statements for four of these cards were received into evidence and total $33,653.37 worth of debt chargeable to the estate if claimed and proven. The Petitioner did not appear upset over what would appear to be a marital financial infidelity. This lends credibility to the balance of the Petitioner's testimony. It appears that he was the earner of the marriage and the Decedent ran the house, was the money manager, and spender. This was their arrangement and how their marriage worked, the Court need not reach further into the details of years of expenditures.

Footnote 7:Given the nature of the credit card debt and the distributions to the Decedent during her life, were this a divorce instead of a death, the Petitioner would likely have a claim for wasteful dissipation of marital assets. The Court had requested the parties to brief the issue of the use of marital funds to finance the home, and what if any impact the use of marital funds would have on the constructive trust issue. The issue was not briefed in the post-trial submissions, but it would appear that the legal terms "marital property" as they are used in Domestic Relations Law §236 (which encompasses assets and debts) may only be adjudicated in the context of a matrimonial action, see, Brandeis School, Inc. v. Yakobowicz, 130AD3d 850 [2nd Dep't. 2015].

Footnote 8:The Petitioner transferred funds to the Decedent well in excess of the value of the home as testified to by either appraiser. The Court need not reach further and make a determination on the value of the home at this juncture.

Footnote 9:Date of Death Value.